2022 UT 43

IN THE

# SUPREME COURT OF THE STATE OF UTAH

RYAN CLYDE KINGSTON,
*Appellant,*

*v.*

JESSICA BENNY KINGSTON,
*Appellee.*

No. 20200350
Heard April 11, 2022
Filed __

On Appeal of Final Decree of Divorce

Third District, Salt Lake
The Honorable Andrew H. Stone
No. 144904226

Attorneys:

Steve S. Christensen, Clinton R. Brimhall, Salt Lake City, for
appellant

Benjamin K. Lusty, Lisa Watts Baskin, Jaryl L. Rencher, Salt Lake
City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
JUDGE MORTENSEN and JUDGE TENNEY joined.

ASSOCIATE CHIEF JUSTICE PEARCE filed a dissenting opinion, in which
JUSTICE PETERSEN joined.

Having recused himself, JUSTICE LEE did not participate herein;
COURT OF APPEALS JUDGE RYAN D. TENNEY sat.

Due to his retirement, JUSTICE HIMONAS did not participate herein;
COURT OF APPEALS JUDGE DAVID N. MORTENSEN sat.

JUSTICE HAGEN and JUSTICE POHLMAN became members of the Court
after oral argument in this matter and accordingly did not
participate.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1 Ryan and Jessica Kingston[1] divorced in 2016, following eight years of marriage and the birth of four children. At the time of their marriage, Ryan and Jessica were both members of the Order, also known as the Kingston Group, a polygamous religious community. Ryan remains a member of the Order today, but Jessica left the Order before the divorce.

¶2 During the divorce proceedings, the teachings and practices of the Order became a key issue as both Ryan and Jessica sought custody of their four children. Jessica argued that some of the Order's teachings and practices, such as polygamy, were contrary to their children's best interests. The district court found that the children faced potential harm from exposure to the Order—specifically noting the group's practices of grooming children for early marriage and demonizing those, including Jessica, who have left the religion.

¶3 Based on Jessica and Ryan's inability to agree on decisions regarding the children, concerns about Ryan's behavior (including his membership in the Order), and a finding that Jessica had been the children's primary caretaker, the district court granted sole legal custody to Jessica. The court ordered that physical custody be shared by both parents. Addressing its concerns about Ryan's religious beliefs, the court also ordered in the divorce decree that "[t]he children should not be encouraged to adopt the teachings of any religion or be baptized into any religion without the consent of the legal guardian."

¶4 Ryan does not challenge the district court's award of sole legal custody to Jessica or its prohibition against him baptizing the children without her consent. But he argues the court's prohibition against him encouraging the children "to adopt the teachings of any religion" without Jessica's consent violates his fundamental right "to encourage them in the practice of religion"[2] protected by the Due

---

[1] Because both parties share the same last name, we refer to Mr. Kingston as Ryan and Ms. Kingston as Jessica throughout the opinion for ease of reading. The use of first names is in no way intended to show disrespect to the parties.

[2] (Citing *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944).)

Process Clause of the Fourteenth Amendment to the United States Constitution. He also argues that the court's prohibition violates his free speech, free exercise, and parental rights simultaneously under a hybrid rights theory. Alternatively, Ryan argues that even if the prohibition does not violate his constitutional rights, the district court abused its discretion because the prohibition "is not support[ed] by findings that show a rational basis for the ultimate decision." We conclude that Ryan's hybrid rights argument is inadequately briefed, so our analysis focuses on his argument that the prohibition interferes with his fundamental right as a parent. Ryan contends that any interference with this fundamental right must be narrowly tailored to achieve a compelling state interest and that the district court's prohibition was overly broad.

¶5 Jessica counters that Ryan has no fundamental right to assert because he does not have legal custody of the children, and that even if Ryan's fundamental right is implicated, the prohibition was narrowly tailored to address the State's compelling interests in (1) "awarding legal custody based upon the best interests of the children"; (2) "resolving parenting disagreements"; and (3) "shielding the minor children from exposure to psychological harm resulting from teachings found to be harmful to them."

¶6 We agree with Ryan that he has a fundamental right to encourage his children in the practice of religion. And the court's award of sole legal custody to Jessica does not eliminate this fundamental right. Rather, the award of legal custody to Jessica limits Ryan's parental right only to the extent necessary to provide Jessica with the authority to make major decisions for the children.

¶7 We also hold that the district court's prohibition against Ryan "encourag[ing] [the children] to adopt the teachings of any religion" is not narrowly tailored to address the potential harms identified by the court. So we remand to the district court to craft a more narrowly tailored remedy. Because we determine that the prohibition violates Ryan's fundamental right—and are remanding on this basis—we do not reach his alternative argument that the district court abused its discretion by failing to make adequate findings to support its prohibition.

## Background

¶8 Ryan and Jessica grew up in a polygamist religious community known as the Order. They were married in 2008 and subsequently had four children together. At the time of their marriage, Ryan was twenty-one years old and Jessica was only

sixteen. Jessica gave birth to their first child just six months after turning eighteen.

¶9 On July 29, 2014, Ryan and Jessica separated, and at that time, Jessica sought and was granted a temporary protective order from Ryan. The following month, Ryan filed a petition for conciliation, but Ryan and Jessica were unable to work out their differences.

¶10 Ryan filed for divorce in July 2015. The divorce trial began in September 2016. The district court bifurcated the proceedings, granting the divorce on September 27, 2016, but "reserving the remainder of the certified issues for further trial."

¶11 After the divorce was granted, but before the resolution of the rest of the divorce proceedings, Ryan began to practice polygamy, entering into two new marriages. One of Ryan's new wives was a teenager who "had only weeks before testified at trial that she herself had no intentions of marrying Ryan." The other was Jessica's half-sister. Leading up to the second part of the divorce trial in July 2019, Ryan and Jessica engaged in discovery, debated several motions that are not relevant to this appeal, completed two full custody evaluations, and unsuccessfully attempted to mediate their outstanding differences.

¶12 In July 2019, an eight-day trial took place, with the district court hearing testimony from dozens of witnesses, including multiple custody evaluators. After the trial, the court granted Jessica sole legal custody, determining a sole legal custodian was necessary because Ryan and Jessica were unable to agree on major decisions. The court decided to award Jessica sole legal custody because it found that she had been the primary caretaker of the children and that "Ryan's religious practices . . . represent a direct threat of harm to the children."

¶13 The court made both general and specific findings that Ryan's religious beliefs could be harmful to the children, stating that "[t]he Order's religious teachings jeopardize the health or safety of the children, and will cause harm to the children's welfare." Specifically, the court raised two concerns: (1) that the Order promotes the grooming of young girls to be child brides; and (2) that "[t]he Order's teachings alienate the children from their mother" because "the Order community as a whole engages in ostracizing outsiders and demonizing people who have chosen to leave the group; actually referring to them as 'the Devil' or 'of the Devil.'" And these concerns were exacerbated because "Ryan prioritizes plural marriages and adhering to his religious practices" over the best interests of the children.

¶14 The court was particularly concerned that "the parties have three young girls who[m] Ryan wishes to raise in a culture that grooms them to be child brides." The court noted that Ryan had married Jessica, when she was only sixteen, and a second wife, who was only eighteen at the time of marriage. The court determined that "the potential for the 'grooming' of girls and young women in the Order represents a potential for significant social burdens, and the parties' daughters should be reasonably protected from the potential harms related to grooming."

¶15 Turning to its concern that the children may be alienated from Jessica by the Order's teachings, the court noted that "[a]ny attempts to teach the children to denounce Jessica would be abusive." The court found "that the Order community as a whole engages in ostracizing outsiders" and that exposure to these teachings "would be tantamount to abuse."

¶16 The court also found that Ryan's decision to marry Jessica's half-sister and an eighteen-year-old while the divorce was pending, coupled with his desire that the children attend Order-run schools and extracurricular activities, was "indicative of his inability to prioritize the well-being of his children." The court found that Ryan's two marriages exposed the children to "[t]he inherent confusion that comes with such intermingled familial relationships" and were not in the children's best interests. Looking at educational choices, the court found that Ryan had prioritized the Order over the children's best interests by insisting they attend Ensign Academy, a school run by the Order, despite the school lacking "qualified or licensed educators." This finding was supported by evidence demonstrating that the curriculum at Ensign Academy emphasizes "obedience to the 'Order'" and "compliance to Kingston authority figures," while also "encourag[ing] the children to reject outsiders"—including by teaching them "a 'Memory Gem' that taught, 'If the Order doesn't have it, we don't need it.'"

¶17 Despite these concerns, the court granted Ryan and Jessica shared physical custody of the children, recognizing that "[b]oth parents have shown an ability to address the physical, psychological, and emotional needs of the children, though the evidence strongly favors Jessica on this point." The court noted that although major decisions were a source of conflict, "day-to-day decisions regarding the children appear to be different," as Ryan and Jessica had been able to "coordinat[e] travel and pick-ups[] and jointly supervis[e] and facilitat[e] their children's homework and activities . . . with relatively little conflict." The court also found that "[e]ach parent has demonstrated responsibility in caring for the children" and that "the

children are happy, healthy, and thriving." Based on these findings, the court granted shared physical custody—with Jessica as the custodial parent—requiring that Ryan get at least the minimum amount of time with the children set out in Utah Code section 30-3-35.1.

¶18 As part of the parenting plan, the court ordered that "the children shall not be encouraged to adopt the teachings of any religion or be baptized into any religion without the consent of the legal guardian." Ryan filed a motion for the district court to amend its findings of fact, conclusions of law, and judgment, but the district court made only one minor revision, which did not address the prohibition against religious encouragement.

¶19 Ryan appealed, arguing the prohibition against religious encouragement violates his constitutional rights under the First and Fourteenth Amendments and that, even if it does not violate his constitutional rights, it is an abuse of the district court's discretion. Specifically, he contends the order violates his fundamental right as a parent protected by the Due Process Clause and his free speech, free exercise, and parental rights simultaneously under a hybrid rights theory. The case was certified to us by the court of appeals. We have jurisdiction under Utah Code section 78A-3-102(3)(b).

## Standard of Review

¶20 We review custody determinations deferentially, and so long as the district court's "discretion is exercised within the confines of the legal standards we have set, and the facts and reasons for the decision are set forth fully in appropriate findings and conclusions, we will not disturb the resulting award."[3] But to the extent Ryan's appeal is based on an alleged violation of his constitutional rights, we review the district court's decisions on constitutional issues for correctness.[4]

## Analysis

¶21 Ryan argues that the district court violated his constitutional rights and abused its discretion by prohibiting him from

---

[3] *Davis v. Davis*, 749 P.2d 647, 648 (Utah 1988) (citations omitted).

[4] *In re Adoption of K.T.B.*, 2020 UT 51, ¶ 15, 472 P.3d 843 ("Constitutional issues, including questions regarding due process, are questions of law, and we review the lower court's conclusions for correctness." (citation omitted)).

"encourag[ing] [the children] to adopt the teachings of any religion . . . without the consent of the legal guardian." He presents two overarching arguments: (1) the prohibition violates Ryan's constitutional rights "under both a substantive due process theory and under a hybrid free speech/free exercise/parental rights theory"; and (2) in the alternative, even if the district court's order is constitutionally sound, the district court's "findings do not logically, rationally, or reasonably justify the prohibition."

¶22 Looking at Ryan's constitutional arguments, we start by noting that Ryan's hybrid rights argument is inadequately briefed.[5]

---

[5] Ryan's hybrid rights argument does not satisfy the requirement of rule 24 of the Utah Rules of Appellate Procedure that an "argument must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." UTAH R. APP. P. 24(a)(8). Ryan points to "the hybrid exception alluded to in *Smith*," referring to *Employment Division v. Smith*, 494 U.S. 872, 877 (1990), to argue that free exercise claims "brought in conjunction with parental right or free speech claims" are subject to heightened scrutiny. But he does not cite binding caselaw or meaningfully engage with the conflict between various courts about how the language from *Smith* suggesting a hybrid rights exception should be interpreted. *See, e.g., Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993) (holding that the hybrid rights theory leads to "completely illogical" outcomes and refusing to apply it); *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999) (recognizing that *Smith* "excepts a hybrid-rights claim from its rational basis test"). In addition to disagreeing about the existence of a hybrid rights exception, "[c]ourts are . . . divided on the strength of the independent constitutional right claim that is required to assert a cognizable hybrid rights claim." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 656 (10th Cir. 2006). Ryan does not sufficiently explain why this court should recognize a hybrid rights exception based on *Smith* or how it should be applied. He relies almost entirely on the Pennsylvania Supreme Court's application of the hybrid rights exception in *Shepp v. Shepp*, 906 A.2d 1165 (Pa. 2006), but does not engage with caselaw suggesting no such exception exists. Instead, he states that even if the hybrid rights exception is not real, free speech alone would be protected here. But he does not develop an independent free speech argument, stating in his reply brief that "[his] free speech arguments are tied to his parental rights and free exercise arguments as part of

(continued . . .)

So our constitutional analysis is limited to Ryan's argument that the district court's prohibition interferes with his fundamental right as a parent "to encourage [his children] in the practice of religion." And because we resolve the case based on Ryan's fundamental parental right, we do not reach his alternative argument that even if the prohibition is constitutional, the district court's findings do not adequately support it. Ryan's fundamental right argument is two-fold. He argues that (1) the district court's prohibition must satisfy strict scrutiny because it interferes with a fundamental right; and (2) the prohibition is not narrowly tailored to address the compelling interests identified by the court.

¶23 Jessica counters that (1) because Ryan does not have legal custody of the children, he has no fundamental right at issue; and (2) even if strict scrutiny applies, the prohibition is narrowly tailored to fit a compelling state interest.

¶24 We agree with Ryan that parents have a fundamental right to encourage their children in the practice of religion under the Due Process Clause of the Fourteenth Amendment. We further determine that the award of sole legal custody to Jessica does not rob Ryan of this right but curtails it only to the extent necessary to give Jessica the authority to make major decisions for the children. And we conclude that strict scrutiny applies because the district court's prohibition interferes with Ryan's fundamental right and goes beyond allocating custody and decision-making authority.

¶25 Next, applying strict scrutiny, we hold that although the district court's prohibition is aimed at serving a compelling governmental interest, it is not narrowly tailored to address that interest. So because the prohibition violates Ryan's constitutional right, we remand to the district court to amend the divorce decree in accordance with this opinion.

I. The District Court's Prohibition Interferes with Ryan's Fundamental Right to Encourage His Children in the Practice of Religion

---

. . . a hybrid claim." Ryan's "failure to provide relevant case law and to develop an argument based on that law leaves us with the task of developing the contours of these important constitutional arguments. We decline to do so." *Ramos v. Cobblestone Ctr.*, 2020 UT 55, ¶ 49, 472 P.3d 910.

¶26 Ryan argues that the district court's order preventing him from encouraging his children to adopt the teachings of any religion without Jessica's consent violates his fundamental right to participate in his children's religious upbringing. He contends that a string of United States Supreme Court cases, starting with *Meyer v. Nebraska*,[6] recognizes a liberty interest protected by the Due Process Clause of the Fourteenth Amendment for parents to give their children "religious training and to encourage them in the practice of religious belief."[7]

¶27 Jessica counters that because she has been awarded sole legal custody, "Ryan does not have a fundamental liberty interest in providing religious instruction to the children contrary to [her] wishes." She contends that "a key distinction between a custodial and a noncustodial parent must be made to determine whether a fundamental liberty interest is indicated."

¶28 To review the district court's limitation on Ryan's parental rights, "we must identify and apply a standard of scrutiny."[8] And to identify the correct level of scrutiny, we must determine if a fundamental right is at issue. "If the right infringed or foreclosed is a right we have deemed 'fundamental,'" we adhere to "our strict scrutiny standard."[9] If the right identified is not fundamental, then the state interference is subject to only deferential, rational basis review.[10]

¶29 "Under the approach established by the Supreme Court, the nature of parental rights is defined based on (1) the status of the individual invoking the right and (2) the parental conduct to be protected."[11] Looking to Supreme Court caselaw, we hold that parents have a fundamental right to encourage their children in the practice of religion. And while an award of legal custody to one parent in a divorce limits the other parent's ability to make major decisions for the children, it does not eliminate this fundamental

---

[6] 262 U.S. 390, 399 (1923).

[7] (Quoting *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944).)

[8] *Jones v. Jones*, 2015 UT 84, ¶ 21, 359 P.3d 603.

[9] *In re Adoption of K.T.B.*, 2020 UT 51, ¶ 32, 472 P.3d 843 (citation omitted).

[10] *Id.*

[11] *Id.* ¶ 59.

right. So any state interference with parents' right to encourage their children in the practice of religion, including the district court's prohibition here, is subject to strict scrutiny.

*A. The United States Supreme Court Has Recognized Parents' Fundamental Right to Encourage Their Children in the Practice of Religion*

¶30 The Due Process Clause of the Fourteenth Amendment to the United States Constitution declares that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." The Supreme Court "ha[s] long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.'"[12] "The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests."[13] And "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court."[14]

¶31 In *Meyer v. Nebraska*, the Supreme Court held that the Due Process Clause refers to liberty beyond "mere[] freedom from bodily restraint," to include individual rights such as "the right of the individual to . . . bring up children."[15] Two years later, the Court again recognized this right in *Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary* as "the liberty of parents and guardians to direct the upbringing and education of children under their control."[16]

¶32 The Court continued to develop its jurisprudence around the rights of parents under the Fourteenth Amendment in two cases addressing parents' right to take part in their children's religious upbringing: *Prince v. Massachusetts*[17] and *Wisconsin v. Yoder*.[18]

---

[12] *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)).

[13] *Glucksberg*, 521 U.S. at 720.

[14] *Troxel*, 530 U.S. at 65.

[15] 262 U.S. at 399.

[16] 268 U.S. 510, 534–35 (1925).

[17] 321 U.S. 158.

[18] 406 U.S. 205 (1972).

¶33 In *Prince*, Ms. Prince, the aunt and legal custodian of a nine-year-old child, argued that Massachusetts's child labor laws unconstitutionally interfered with her "rightful exercise of her religious convictions."[19] She was found to have violated Massachusetts's child labor laws when she took her niece with her to preach and distribute Jehovah's Witness religious materials in the evening.[20] Massachusetts's law prohibited children from selling magazines in the evening and specifically prevented adults from providing magazines to children for this purpose.[21] Guardians were also prohibited from knowingly allowing their children to violate child labor laws.[22]

¶34 Ms. Prince argued that the child labor statutes were unconstitutional as applied to her because they violated both her First Amendment right to freedom of religion and her right under the Due Process Clause of the Fourteenth Amendment to teach her child "the tenets and the practices of [her] faith."[23] The *Prince* Court recognized the significance of these two rights coming together, commenting that "[t]he parent's conflict with the state over control of the child and his training is serious enough when only secular matters are concerned. It becomes the more so when an element of religious conviction enters."[24]

¶35 The *Prince* Court proceeded to balance the State's interest in protecting child welfare through child labor laws against Ms. Prince's "sacred private interests."[25] The Court recognized the right of "parents to give [their children] religious training and to encourage them in the practice of religious belief," noting that "[i]t is cardinal with us that the custody, care[,] and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."[26] But the Court held that "neither rights of religion nor

---

[19] 321 U.S. at 159.

[20] *Id.* at 159, 162.

[21] *Id.* at 160–61.

[22] *Id.*

[23] *Id.* at 164.

[24] *Id.* at 165.

[25] *Id.*

[26] *Id.* at 165–66.

rights of parenthood are beyond limitation,"[27] determining that the child labor laws were necessary to address "the crippling effects of child employment."[28]

¶36 In *Wisconsin v. Yoder*, the Court revisited the right of parents to direct their children's religious upbringing.[29] In that case, a group of Amish parents questioned the constitutionality of a Wisconsin law requiring children to remain in school through the age of sixteen.[30] The Amish parents believed sending their children to school beyond the eighth grade violated their religious tenets, such as independence from the outside world, living cooperatively rather than competitively, and education based on doing rather than formal learning.[31] They believed that complying with the compulsory attendance law and sending their children to high school would "endanger their own salvation and that of their children."[32]

¶37 Like in *Prince*, the Court looked at the intersection of free exercise rights protected by the First Amendment and the fundamental rights of parents protected by the Due Process Clause of the Fourteenth Amendment. The Court recognized that the compulsory education law interfered with the Amish parents' rights "specifically protected by the Free Exercise Clause of the First Amendment" and also the fundamental right "of parents with respect to the religious upbringing of their children."[33]

¶38 The Court concluded, "Even more markedly than in *Prince*, therefore, this case involves the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children."[34] And when balancing the State's interests versus those of the Amish parents, the Court applied a heightened level of scrutiny, stating that "when the interests of parenthood are combined with a free exercise claim of the nature

---

[27] *Id.* at 166.

[28] *Id.* at 168.

[29] *Yoder*, 406 U.S. at 213–14.

[30] *Id.* at 207.

[31] *Id.* at 211.

[32] *Id.* at 209.

[33] *Id.* at 214.

[34] *Id.* at 232.

revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment."[35]

¶39 The Court struck down Wisconsin's compulsory attendance requirement as applied to the Amish parents, holding that the State failed to show with sufficient "particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish."[36]

¶40 Although the *Yoder* Court partially relied on the Free Exercise Clause, it also referred throughout the decision to parents' fundamental right to encourage their children in the practice of religion. The Court referred to the holding in *Pierce* as "stand[ing] as a charter of the rights of parents to direct the religious upbringing of their children."[37] Years later, in *Employment Division v. Smith*, the Court distinguished *Yoder* from other free exercise cases on the basis that the holding rested partially on "the rights of parents to direct the religious upbringing of their children."[38]

¶41 Looking at the chain of cases from *Meyer* to *Yoder*, the Supreme Court has recognized that parents have a fundamental right to encourage their children in the practice of religion.

*B. Parents' Fundamental Right to Encourage Their Children in the Practice of Religion Is Not Dependent upon Legal Custody*

¶42 Jessica does not directly attack the existence of parents' fundamental right to encourage their children in the practice of religion; rather, she argues that it does not extend to Ryan, because she is the sole legal custodian of their children. She contends that under the two-part test used in *In re Adoption of K.T.B.*[39]—looking at both an individual's status and the conduct protected in analyzing parental rights—the fundamental right established by the Supreme Court is limited to those with the status of parent with legal custody.

---

[35] *Id.* at 233.

[36] *Id.* at 236.

[37] *Id.* at 233.

[38] 494 U.S. 872, 881 n.1 (1990) (quoting *Yoder*, 406 U.S. at 233).

[39] 2020 UT 51, ¶ 62.

¶43 Ryan counters that "[t]he correct approach . . . is to view Ryan and other parents who did not win joint or sole legal custody of their children during their divorce as having lost only as much of their parental rights as was necessary to fulfill the government's compelling purpose." He argues that the compelling purpose served by an award of sole legal custody is "to allocate indivisible parental rights, such as deciding which school the child is enrolled at or into what religion the child is formally inducted." According to Ryan, the district court's award of sole legal custody to Jessica limits his parental rights only with regard to these decisions.

¶44 We find Ryan's argument to be more persuasive. Both *Prince v. Massachusetts* and *Wisconsin v. Yoder* describe the fundamental right to "encourage [their children] in the practice of religious belief" as belonging to those with the status of "parent."[40] Jessica is asking us to change "[t]he level of generality" at which the right identified in *Prince* and *Yoder* is framed, but "[t]he level of generality at which an asserted right is framed may properly be considered an unresolved issue only where a party argues that the Due Process Clause protects someone whose (1) status or (2) conduct had not previously received constitutional protection."[41]

¶45 In *In re Adoption of K.T.B.*, we examined this standard by looking at two cases where the Supreme Court addressed the level of generality of a right when an individual's status had previously not received constitutional protection: (1) the status of foster parents, analyzed in *Smith v. Organization of Foster Families for Equality & Reform*;[42] and (2) the status of an unmarried father of a child born into a woman's existing marriage with another man, analyzed in *Michael H. v. Gerald D.*[43] In both of those cases, the Court looked to

---

[40] *Prince*, 321 U.S. at 165 (referring to the right of "*parents* to give [their children] religious training and to encourage them in the practice of religious belief" (emphasis added)); *Yoder*, 406 U.S. at 233 ("[T]he court's holding in *Pierce* stands as a charter of the rights of *parents* to direct the religious upbringing of their children." (emphasis added)).

[41] *In re Adoption of K.T.B.*, 2020 UT 51, ¶ 70.

[42] *Id.* (citing *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 839 (1977)).

[43] *Id.* ¶ 72 (citing *Michael H. v. Gerald D.*, 491 U.S. 110, 125 (1989) (plurality opinion)).

the traditional meaning of "parent," recognizing that "the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in this Nation's history and tradition."[44]

¶46 Unlike foster parents, whose constitutional rights as parents presented a novel question,[45] and unwed fathers of children born into another marriage, whose rights had not historically been recognized,[46] Ryan is the biological parent of children born into his marriage—a "parent" that has traditionally received constitutional protection. He does not belong to a group that "ha[s] not previously received constitutional protection,"[47] so we frame the asserted right at the same level of generality used by the *Prince* and *Yoder* Courts—a right belonging to "parents."[48]

¶47 Still, as Ryan concedes, his right to encourage his children in the practice of religion is limited by his loss of legal custody. As the sole legal custodian of their children, Jessica has the "power and duty to make the most significant decisions about [the children's] life and welfare."[49] Any decision to baptize the children, for example, falls squarely within this authority.

¶48 But Ryan's loss of legal custody does not mean he is completely bereft of parental rights. The district court's parenting plan calls for shared physical custody and notes that "[t]he parent with which the children are then located should make day-to-day decisions involving the children," subject to the outlined restrictions.

---

[44] *Smith*, 431 U.S. at 845 (footnote omitted) (citation omitted) (internal quotation marks omitted).

[45] *In re Adoption of K.T.B.*, 2020 UT 51, ¶ 70 (citing *Smith*, 431 U.S. at 839–40).

[46] *Id.* ¶ 72 (citing *Michael H.*, 491 U.S. at 125).

[47] *Id.* ¶ 70.

[48] *Prince*, 321 U.S. at 165; *Yoder*, 406 U.S. at 233.

[49] *Hansen v. Hansen*, 2012 UT 9, ¶ 17, 270 P.3d 531 (citation omitted) (distinguishing legal custody from physical custody, the latter of which involves the "right, obligation, and 'authority to make necessary day-to-day decisions concerning the child's welfare'" (quoting SANDRA MORGAN LITTLE, CHILD CUSTODY & VISITATION LAW AND PRACTICE § 10.03(3)(b)(i), (iii) (2011))).

Utah Code section 30-3-33, which lists advisory guidelines for parenting plans where parents share physical custody, suggests that parents without legal custody should still be notified and allowed to participate in "all significant school, social, sports, and community functions"; "have access directly to all school reports"; and have an equal opportunity to share holidays with their children.[50] Ryan has not lost the right to be his children's parent—just the right "to make the most significant decisions about [the children's] life and welfare."[51]

¶49 Jessica's status as sole legal custodian curtails Ryan's fundamental right to encourage his children's practice of religion only with respect to major decisions. And because the district court's prohibition against Ryan "encourag[ing] [the children] to adopt the teachings of any religion" is not limited to the most significant decisions, it interferes with Ryan's fundamental parental right.

*C. Strict Scrutiny Applies Because the District Court's Prohibition Interferes with Ryan's Fundamental Right and Goes Beyond Allocating Custody and Major Decision-Making Authority*

¶50 When the United States Supreme Court "has recognized a due process right it deems 'fundamental,' it consistently has applied a standard of strict scrutiny to the protection of such a right."[52] The dissent agrees "that parents have a fundamental right to influence the religious upbringing of their children."[53] Yet it disagrees that strict scrutiny applies to this case, instead asserting that "we have repeatedly applied the best interest test to evaluate questions that implicate a parent's fundamental parental rights."[54]

¶51 In support of this assertion, the dissent relies on three cases involving custody determinations: *Doyle v. Doyle,*[55] *Clarke v. Clarke,*[56]

---

[50] *See* UTAH CODE § 30-3-33(11), (12), & (17).

[51] *Hansen,* 2012 UT 9, ¶ 17 (citation omitted) (internal quotation marks omitted).

[52] *Jones,* 2015 UT 84, ¶ 26.

[53] *Infra* ¶ 78.

[54] *Infra* ¶ 81.

[55] 2011 UT 42, 258 P.3d 553 (reviewing father's challenge to district court's transfer of sole custody from himself to child's mother).

and *Hogge v. Hogge*.[57] We do not dispute that courts, including ours, routinely allocate custody and decision-making authority based on the best interests of the child. But by relying on cases where courts allocated custody, the dissent misses what is unique about the district court's prohibition in this case: it is not a custody allocation. The prohibition is not about which parent is better suited to make major decisions or have physical custody of the children. The court separately addressed custody, determining that it was in the best interests of the children for Jessica to have legal custody but for both parents to share physical custody. The court went beyond allocating custody when it prohibited Ryan from encouraging his children to adopt the teachings of any religion.

¶52 In *Reno v. Flores*, the United States Supreme Court distinguished an allocation of custody from an exercise of custody and explained that the best interests of the child standard does not govern the latter:

> "The best interests of the child," a venerable phrase familiar from divorce proceedings, is a proper and feasible criterion for making the decision as to which of two parents will be accorded custody. But it is not traditionally the sole criterion—much less the sole *constitutional* criterion—for other, less narrowly channeled judgments involving children, where their interests conflict in varying degrees with the interests of others. Even if it were shown, for example, that a particular couple desirous of adopting a child would *best* provide for the child's welfare, the child would nonetheless not be removed from the custody of its parents so long as they were providing for the child *adequately. Similarly, "the best interests of the child" is not the legal standard that governs parents' or guardians' exercise of their custody*: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other

---

[56] 2012 UT App 328, 292 P.3d 76 (reviewing father's challenge to district court's custody award).

[57] 649 P.2d 51 (Utah 1982) (reviewing father's challenge to district court's transfer of custody from himself to child's mother).

children, or indeed even to the interests of the parents
or guardians themselves.[58]

The prohibition at issue here does not allocate custody. Rather, it governs Ryan's exercise of his physical custody. This distinction is significant, and the dissent errs by equating the prohibition to an allocation of custody.

¶53 Noting the significant impact of custody decisions on parental rights, the dissent argues that if the court can do more, then it must be able to do less. So, the dissent's argument follows, if a court can completely strip a parent of physical or legal custody based on the best interests of the child, then a court must also be able to interfere with a parent's fundamental rights in any less intrusive way. But divorce does not eliminate a parent's fundamental rights.[59]

¶54 And while the best interests of the child standard is of primary importance when allocating decision-making authority as to major decisions, strict scrutiny applies to court orders that go beyond this allocation to restrict a parent's fundamental right to encourage his or her children in the practice of religion. In *In re Marriage of McSoud*, the Colorado Court of Appeals distinguished court orders that allocate "sole decision making over the child's religious upbringing" from those that "go[] beyond" allocating this decision-making authority.[60] In that case, a mother challenged district court orders allocating parental rights and restricting parents' engagement in their child's religious upbringing. The district court allocated "sole decision-making regarding the child's religious upbringing" to the father.[61] It also entered permanent orders that subjected the child's religious upbringing to recommendations made by a special advocate, including a recommendation prohibiting both parents from giving "mixed

---

[58] *Reno v. Flores*, 507 U.S. 292, 303–04 (1993) (emphasis in last sentence added) (citations omitted).

[59] *See, e.g., Pater v. Pater*, 588 N.E.2d 794, 801 (Ohio 1992) (concluding that "parents' right to expose their children to their religious beliefs . . . does not automatically end when they are divorced").

[60] 131 P.3d 1208, 1217 (Colo. App. 2006).

[61] *Id.* at 1219.

messages" about religion to the child and another that dictated which parent could take the child to church activities.[62]

¶55 In reviewing the mother's challenge, the Colorado Court of Appeals recognized that "[p]arents have a fundamental right to make decisions concerning the care, custody, and control of their children."[63] The court further noted that "[a] parent's right to determine the religious upbringing of a child derives from the parent's right both to exercise religion freely and to the care, custody, and control of a child."[64]

¶56 The court concluded "that in allocating sole religious decision-making to father, the [district] court properly treated 'the best interests of the child [as] of primary importance,'"[65] reasoning that "as a matter of law, this allocation does not alone deny mother's additional First Amendment rights to influence the child's religious upbringing during her parenting time or to exercise her own religious beliefs."[66] But it concluded that strict scrutiny was appropriate for the orders that went beyond allocating this decision-making authority, including the orders about giving the child mixed religious messages and taking the child to church activities, reasoning that "the best interests standard" was limited by "a parent's constitutional rights as to religious upbringing of the child."[67] These two orders were remanded to the district court "[b]ecause the court did not discuss a compelling state interest" and "instead relied on the best interests test."[68]

¶57 Although, unlike here, the court in *McSoud* reviewed the mother's challenge under "both the Free Exercise Clause and a parent's fundamental right to the care, custody, and control of a child,"[69] it made no attempt to distinguish between the two rights, and there is nothing in the court's opinion to indicate that the

---

[62] *Id.* at 1218.

[63] *Id.* at 1215 (citing *Troxel*, 530 U.S. at 57).

[64] *Id.* (citing *Yoder*, 406 U.S. 205).

[65] *Id.* at 1219 (second alteration in original) (citation omitted).

[66] *Id.*

[67] *Id.* at 1217.

[68] *Id.*

[69] *Id.* at 1216.

parental right standing alone would be inadequate to mandate strict scrutiny. In remanding the issues, the court provided the following guidance:

> To the extent that, on remand, the court goes beyond allocating sole decision making over the child's religious upbringing and otherwise restricts either parent's right to expose the child to that parent's religious beliefs or to practice that parent's religion, the court must find a compelling state interest in the form of avoiding substantial emotional or physical harm to the child.[70]

In other words, the court directed that strict scrutiny be applied on remand if the district court (1) goes beyond allocating sole decision-making authority and (2) restricts a parent's Free Exercise right or the fundamental right to expose the child to that parent's religious beliefs. We agree with this reasoning and conclude that here, the incursion on Ryan's fundamental right to encourage the children in the practice of religion mandates we apply strict scrutiny to the district court's prohibition.

¶58 The dissent maintains that many of the issues in this case would be more easily resolved if we had "[a] properly briefed First Amendment challenge,"[71] emphasizing that "the analysis changes" if a parent "claims that the district court's restrictions violate his individual First Amendment right" because "[u]nlike shared parental rights, a district court cannot compromise those individual rights unless the order can withstand strict scrutiny."[72] The dissent seems to suggest that while Ryan might have prevailed on a First Amendment claim, he ultimately loses on his claim based on his fundamental right to encourage the children in the practice of religion. We see no reason to subordinate one of Ryan's constitutional rights to another and are not convinced by the dissent's suggestion that we should do so here simply because parental rights are "shared" and First Amendment rights are not.

¶59 As mentioned, the district court awarded shared physical custody to Ryan. Its award of legal custody to Jessica is not, in and of itself, a justification for stripping Ryan of the full range of his

---

[70] *Id.* at 1217.

[71] *Infra* ¶ 100.

[72] *Infra* ¶ 85 n.93.

fundamental parental rights. While he does not challenge Jessica's right, consistent with the legal custody she enjoys, to make major religious decisions with respect to the children, he does, as a custodial parent, challenge the district court's broad restriction on his right to encourage his children with respect to religion. Any such restriction should be required to pass strict scrutiny muster. Although many courts have found the best interests of the child standard to be a necessary tool when faced with parents' competing rights to custody and control over their children, this does not mean that divorced parents are subject to limitless interference with their fundamental parental rights free of strict scrutiny review.

¶60 The district court's prohibition curtails Ryan's parental rights beyond assigning all major decision-making—which is all an award of legal custody is supposed to do[73]—to Jessica. Preventing Ryan from "encourag[ing] [the children] to adopt the teachings of any religion" without first receiving Jessica's permission implicates Ryan's day-to-day life with the children and the decisions he is otherwise entitled to make during his legal visitation periods. And, contrary to the dissent's analysis, the statutory scheme for granting custody based on a child's best interests cannot, absent a showing that the strict scrutiny standard has been met, displace a right guaranteed by the United States Constitution.

## II. The District Court's Prohibition Is Not Narrowly Tailored to Address the Identified Harms

¶61 Under strict scrutiny, "a fundamental right is protected except in the limited circumstance in which an infringement of it is shown to be 'narrowly tailored' to protect a 'compelling governmental interest.'"[74] Applying this standard here, we conclude that although the district court's prohibition is aimed at the compelling governmental interest of shielding the children from psychological harm, it is not narrowly tailored to address the identified potential harms.

---

[73] Black's Law Dictionary defines "legal custody" as "[t]he authority to make significant decisions on a child's behalf, including decisions about education, religious training, and healthcare." *Custody*, BLACK'S LAW DICTIONARY (11th ed. 2019). *See also supra* ¶ 47.

[74] *Jones v. Jones*, 2015 UT 84, ¶ 27, 359 P.3d 603 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

*A. The District Court's Prohibition Aims to Shield the Children from Psychological Harm*

¶62 United States Supreme Court caselaw sets a high bar for defining state interests as compelling, indicating that "the state interest in overriding a parent's fundamental rights is 'compelling' only in circumstances involving the avoidance of harm that is *substantial.*"[75]

¶63 Other states that have considered the right of noncustodial parents to encourage their children in the practice of religious belief have applied tests similar to strict scrutiny—requiring that any incursion on a parent's fundamental right be directly tied to preventing harm to the children. In *Zummo v. Zummo*, the Pennsylvania Supreme Court held that a court can only interfere with "a parent's post-divorce parental rights regarding the religious upbringing of his or her children" when there is a "substantial threat of physical or mental harm to the child" and the court is using the "least intrusive measures adequate to protect the interests identified."[76] The California Court of Appeals, in *In re Marriage of Murga*, adopted the rule of "the majority of American jurisdictions" that courts may not "restrain the noncustodial parent from exposing the minor child to his or her religious beliefs and practices, absent a clear, affirmative showing that these religious activities will be harmful to the child."[77]

¶64 Although these courts did not use the term "strict scrutiny," the tests they applied are almost identical to our application of strict scrutiny. We require courts to identify a compelling state interest and recognize "the avoidance of harm that is *substantial*" as one such interest.[78] The *Zummo* court required a showing of "a substantial risk of harm"[79] and the *Murga* court similarly required a showing "that the child will be . . . harmed."[80] Like our court's requirement for narrow tailoring, the *Zummo* court's requirement that the "least

---

[75] *Id.* ¶ 32.

[76] 574 A.2d 1130, 1140–41 (Pa. 1990) (internal quotation marks omitted).

[77] 163 Cal. Rptr. 79, 82 (Ct. App. 1980).

[78] *Jones*, 2015 UT 84, ¶ 32.

[79] 574 A.2d at 1140.

[80] 163 Cal. Rptr. at 82.

intrusive measures adequate" be used and the *Murga* court's requirement that a court show that "these religious activities will be harmful to the child" both require a direct connection between the prohibited conduct and the potential harm. And our court has held that when "the right infringed or foreclosed is a right we have deemed 'fundamental,'" we adhere to "our strict scrutiny standard."[81]

¶65 Jessica argues that the district court's prohibition survives strict scrutiny because it protects three compelling state interests: (1) "the state's interest in awarding legal custody based upon the best interests of the child"; (2) "the state's compelling interest in resolving parental disagreements"; and (3) "the state's compelling interest[] [in] shielding the minor children from exposure to psychological harm resulting from teachings found to be harmful to them."

¶66 First, while we agree with Jessica that the State has a compelling interest in awarding legal custody based on the best interests of the child,[82] the district court's prohibition goes beyond this interest. And Ryan has not challenged the award of sole legal custody to Jessica in this appeal. As discussed above, because Jessica has legal custody of the children, she has the authority to make the "most significant decisions" about their upbringing.[83] But the district court's prohibition includes no such limiting principle—it forbids Ryan from "encouraging [the children] to adopt the teachings of any religion," without distinguishing between major decisions, like baptism, and minor decisions, like saying grace in front of the children before a shared meal or taking them to a learning day at a synagogue.

¶67 Second, the State's interest in "resolving parental disagreements" is not typically a compelling interest. This is because it is not usually an interest aimed at preventing harm that is

---

[81] *In re Adoption of K.T.B.*, 2020 UT 51, ¶ 32, 472 P.3d 843.

[82] *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The goal of granting custody based on the best interests of the child is indisputably a substantial governmental interest for purposes of the Equal Protection Clause.").

[83] *Hansen v. Hansen*, 2012 UT 9, ¶ 17, 270 P.3d 531 (citation omitted) (internal quotation marks omitted).

substantial.[84] Several states have addressed what restrictions are appropriate when divorced parents have conflicting religious beliefs, and "the vast majority" of them

> have concluded that each parent must be free to provide religious exposure and instruction, as that parent sees fit, during any and all period of legal custody or visitation without restriction, unless the challenged beliefs or conduct of the parent are demonstrated to present a substantial threat of present or future, physical or emotional harm to the child in absence of the proposed restriction.[85]

We agree with these states that preventing children from exposure to conflicting religions is not in itself a compelling interest. Indeed, "it's plausible that children may benefit from being taught just one religion—but it's also plausible that they may benefit from being taught two."[86] The State's interest in resolving parental disagreements about religion must be tied to preventing "a substantial threat of present or future, physical or emotional harm to the child" in order to be compelling. And the district court's findings do not tie disagreement between Ryan and Jessica over day-to-day decisions to any substantial threat of harm to the children.[87]

---

[84] *See Jones*, 2015 UT 84, ¶ 32.

[85] *Zummo*, 574 A.2d at 1154–55 (collecting cases).

[86] Eugene Volokh, *Parent-Child Speech and Child Custody Speech Restrictions*, 81 N.Y.U. L. REV. 631, 719 (2006).

[87] The district court found that although major decisions were a source of conflict, "day-to-day decisions regarding the children appear to be different," as Ryan and Jessica had been able to "coordinat[e] travel and pick-ups[] and jointly supervis[e] and facilitate[e] their children's homework and activities . . . with relatively little conflict."

¶68 But we agree with Jessica that the State has a compelling interest in shielding the children from psychological harm. The district court found that "[t]he Order's religious teachings jeopardize the health or safety of the children, and will cause harm to the children's welfare." Specifically, the court identified two potentially substantial harms to the children associated with Ryan's religious beliefs: (1) grooming of the children for early marriage; and (2) exposure to Order teachings that ostracize outsiders and demonize those who have left the group, including Jessica. Protecting the children from these harms is a compelling state interest.

### B. The District Court's Prohibition Is Not Narrowly Tailored to Address the Identified Potential Harms to the Children

¶69 Having recognized that the district court's prohibition protects a compelling governmental interest, we must assess whether it was narrowly tailored to meet that objective. "In other words, we consider whether the challenged [prohibition] w[as] 'necessary' to achieve the state's purpose . . . ."[88]

¶70 The district court's prohibition is broader than necessary to prevent the identified potential harms to the children. The court prohibited Ryan from "encourag[ing] [the children] to adopt the teachings of *any* religion" without Jessica's consent.[89] This prohibition applies broadly to "the teachings of any religion," but the court only identified specific harms associated with the Order. As written, the prohibition would prevent Ryan from teaching the children the Lord's Prayer or encouraging them to adopt the teachings of Islam. Based on a plain language reading of the prohibition, Ryan would have to seek Jessica's consent before engaging in either of these activities. The prohibition cannot be described as "narrowly tailored" when it reaches far beyond the compelling interest it is meant to address.

¶71 And while there is a relationship between the identified potential harms to the children and the district court's prohibition, this is not enough to satisfy strict scrutiny. Barring Ryan from "encourag[ing] [the children] to adopt the teachings of any religion" is not narrowly tailored to protecting a compelling state interest.

---

[88] *In re Adoption of K.T.B.*, 2020 UT 51, ¶ 43.

[89] (Emphasis added.)

## Conclusion

¶72 The district court's prohibition against Ryan "encourag[ing] [the children] to adopt the teachings of any religion . . . without [Jessica's] consent" interferes with Ryan's fundamental right protected by the Due Process Clause of the Fourteenth Amendment. Parents have a fundamental right to encourage their children in the practice of religion. Awarding one parent legal custody does not deprive the other parent of this right beyond limiting the noncustodial parent's authority to make major decisions for the children. Because the district court's prohibition interferes with Ryan's fundamental right, it is subject to strict scrutiny. And while the State has a compelling interest in protecting the children from harm, the district court's prohibition is not narrowly tailored to address the harms identified. We remand for the court to craft a more narrowly tailored remedy.

ASSOCIATE CHIEF JUSTICE PEARCE, dissenting in the Opinion of the Court:

¶73 The majority applies strict scrutiny to a district court's order allocating to the custodial parent the sole ability to determine her children's religious upbringing. This is an unprecedented step. Never before have we applied strict scrutiny to the allocation of parental rights between two divorcing parents. Until today, we have followed the statutory framework that makes the child's best interest the paramount concern and permits a court to allocate a fundamental parental right to one parent when presented with evidence that the other parent's exercise of that right risks harm to the child. Strict scrutiny review should be reserved to those cases where a district court's allocation of parental rights infringes a separate constitutional right—such as a parent's First Amendment right. But here, where Ryan has inadequately briefed his First Amendment challenge, there is no cause for strict scrutiny review. I respectfully dissent.

¶74 The district court's order prohibits Ryan from "encourag[ing]" his children "to adopt the teachings of any religion" without Jessica's consent. As I see it, and seemingly as does the majority, the district court's order implicates three separate rights: Ryan's right to make major decisions concerning the children's religious upbringing; Ryan's right to make minor, or day-to-day, decisions concerning the children's religious upbringing; and Ryan's First Amendment right. Ryan challenges the district court's ruling only as it affects the last two of these rights.

¶75 The majority determines that Ryan's First Amendment argument is inadequately briefed, thereby limiting its "constitutional analysis . . . to Ryan's argument that the district court's prohibition interferes with his fundamental right as a parent 'to encourage [his children] in the practice of religion.'" *Supra* ¶ 22 (second alteration in original). I agree with that assessment.

¶76 But the majority also concludes that "Jessica's status as sole legal custodian curtails Ryan's fundamental right to encourage his children's practice of religion only with respect to major decisions." *Supra* ¶ 49. "And because the district court's prohibition against Ryan 'encourag[ing] [the children] to adopt the teachings of any religion' is not limited to the most significant decisions, it interferes with Ryan's fundamental parental right" and is therefore subject to strict scrutiny. *Supra* ¶ 49 (alterations in original). I cannot agree with that.

¶77 By statute, all parental rights—including the rights to make major and minor decisions concerning the children's religious upbringing—are subject to allocation by the district court based on the best interest of the children. Strict scrutiny review comes into play only to the extent that the district court's allocation of parental rights impacts a parent's First Amendment right.

I. Child Custody Orders Assigning Parental Rights Are Subject to the Best Interest of the Children, Not Strict Scrutiny

¶78 The majority first asserts that parents have a fundamental right to influence the religious upbringing of their children. *Supra* Part I.A. I agree.[90] But the majority also concludes that a district

---

[90] I do note, however, that none of the cases the majority relies upon in Part I.A of its opinion involve the kind of dispute at issue in this case, even when that dispute is characterized as broadly as a common custody dispute between divorcing parents. For this reason, these cases do nothing more than cement the existence of a parent's fundamental right to participate in the child's religious upbringing. *See Jones v. Jones*, 2015 UT 84, 359 P.3d 603 (contemplating whether a child's grandparents can be given visitation rights against the will of the child's only surviving parent); *In re Adoption of K.T.B.*, 2020 UT 51, 472 P.3d 843 (addressing a trial court's denial of a mother's motion to intervene in the adoption of her daughter to a third party); *Troxel v. Granville*, 530 U.S. 57 (2000) (examining two grandparents' petition for visitation with children born out of wedlock); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (restricting a state from prohibiting

(continued . . .)

court's decision assigning this fundamental parental right to one parent over the other to promote the best interest of the children is subject to strict scrutiny review. *Supra* Part I.C. I disagree.

¶79 Utah Code provides that decisions concerning custody and post-divorce parental rights should be made in accordance with the children's best interest. UTAH CODE § 30-3-10(2) ("In determining *any* form of custody and parent-time under [Utah Code section 30-3-10(1)], the court shall consider the best interest of the child . . . ." (emphasis added)). The Code further states, "*Absent a showing by a preponderance of evidence of real harm or substantiated potential harm to the child . . .* it is in the best interests of the child to have both parents actively involved in parenting the child." *Id.* § 30-3-32(2)(b)(iii) (emphasis added). Utah Code includes "the child's education, healthcare, and religious upbringing" as elements of parenting a child. *See id.* § 30-3-10.9(5)(a) (listing required elements of a parenting plan).

¶80 Under Utah law, therefore, it is presumptively in the best interest of the children for both parents—regardless of custodial status—to participate in the religious upbringing of their children. *Id.* § 30-3-32(2)(b)(iii). That presumption may be overcome, however, upon "a showing by a preponderance of evidence of real harm or substantiated potential harm to the child[ren]." *Id.* § 30-3-32(2)(b). When such a showing is made, as it was here, the district court is charged with allocating the parental right to direct the children in the practice of religion in accordance with the children's best interest.[91] *See id.* § 30-3-10(2).

---

a parent from teaching her child a language besides English "under the guise of protecting the public interest"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925) (deciding that a state law requiring young children to attend public school "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control"); *Prince v. Massachusetts*, 321 U.S. 158 (1944) (upholding a state law prohibiting children from selling magazines in the evening); *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (concluding that a state may not compel Amish parents to send their children to high school).

[91] One way to think about this question involves the bundle of sticks metaphor we all learned in law school. Parents possess a bundle of rights, or sticks, with respect to their children. When the

(continued . . .)

¶81 With this framework in mind, we have repeatedly applied the best interest test to evaluate questions that implicate a parent's fundamental parental rights. Indeed, many of the decisions that a district court may need to make in a case involving divorcing parents with children touches such rights. For example, this court has held that the best interest test is the correct standard to apply in a case granting a parent sole decision-making authority over the other parent's objections. *See Doyle v. Doyle*, 2011 UT 42, ¶¶ 3, 19–20, 24, 258 P.3d 553. That authority included the ability to enroll the child in special education classes and counseling. *See id.* ¶¶ 14, 16.

¶82 Additionally, our court of appeals has concluded that because a father "lack[ed] the ability to compromise [and] make good decisions quickly," and would not "act in the children's best interests with respect to their health and safety," that all medical and health care decisions be left to the mother who possessed "the ability to be flexible and compromise to promote the children's best interest." *Clarke v. Clarke*, 2012 UT App 328, ¶¶ 5, 8, 292 P.3d 76 (alterations in original).

¶83 Perhaps more strikingly, this court upheld a district court's ruling that stripped a parent of all physical custody of his children after examining whether that decision was in the children's best interest. *Hogge v. Hogge*, 649 P.2d 51, 55–56 (Utah 1982).

¶84 *Doyle, Clarke,* and *Hogge* all involved a parent's fundamental rights. And in each of those cases, we stuck to the statutory framework and affirmed orders after examining them to ensure that they were in the child's best interest. In none of those cases did we require that the district court compromise the child's best interest by narrowly tailoring the order to accommodate the noncustodial parent's parental rights. In none of those cases did we even hint that the Constitution might require strict scrutiny review when a district court allocates parental rights between divorcing parents.

---

state tries to give one of those sticks to a nonparent, or take a stick for itself, strict scrutiny applies. The cases the majority cites in Part I.A of its opinion speak to this situation. *See, e.g., Jones*, 2015 UT 84; *In re Adoption of K.T.B.*, 2020 UT 51; *Pierce*, 268 U.S. 510. But when two parents divorce, the district court must determine whether those parents can continue to share the sticks and if not, which parent should possess which stick. As we explain later, we have not applied strict scrutiny review to these decisions.

¶85 The majority attempts to distinguish the district court order in this case from the "routine[] allocat[ions]" of "custody and decision-making authority" in *Doyle*, *Clarke*, and *Hogge*. *Supra* ¶ 51. The majority opines that the district court "went beyond allocating custody when it prohibited Ryan from encouraging his children to adopt the teachings of any religion." *Supra* ¶ 51. I agree, but that fact does not change the analysis. The statute does not distinguish between the larger questions of custody and decision-making authority and the lesser-included questions of restrictions on routine, day-to-day interactions with a child. The statute certainly does not demand the anomalous result the majority's position dictates—that a court need not apply strict scrutiny to an order that takes away a parent's right to decide what church the child will join, but must apply strict scrutiny to a restriction on what a parent who has lost that right might do to undercut the custodial parent's decisions about the child's religious upbringing.[92] This is a new step for our case law, and one that ignores the logic of *Doyle*, *Clarke*, and *Hogge*. In each of those cases, we upheld a district court order that restricted a parent's fundamental parental right based on the best interest of the child.[93]

¶86 Most states that have considered whether one parent can prevent the other from directing the children's religious upbringing do not apply strict scrutiny. These states instead examine whether there has been a sufficient showing of harm to the child to justify assigning exclusive decision-making to one parent over the other. The California Court of Appeals observed that "in the majority of American jurisdictions that have considered the question, . . . courts have refused to restrain the noncustodial parent from exposing the minor child to his or her religious beliefs and practices, absent a clear, affirmative showing that these religious activities will be harmful to the child." *In re Marriage of Murga*, 163 Cal. Rptr. 79, 82

---

[92] It bears remembering that the district court will have entered such an order only after "a showing by a preponderance of evidence of real harm or substantiated potential harm to the child." UTAH CODE § 30-3-32(2)(b).

[93] But we hasten to add that the analysis changes if that parent claims that the district court's restrictions violate his individual First Amendment right. Unlike shared parental rights, a district court cannot compromise those individual rights unless the order can withstand strict scrutiny.

(Ct. App. 1980) (citations omitted). The California court applied this principle to conclude that "while the custodial parent undoubtedly has the right to make ultimate decisions concerning the child's religious upbringing, a court will not enjoin the noncustodial parent from . . . involving the child in his or her religious activities *in the absence of a showing that the child will be thereby harmed.*" *Id.* (emphasis added).

¶87 The Pennsylvania Supreme Court has similarly decided that a parent "must be free to provide religious exposure and instruction, as that parent sees fit, during any and all period of legal custody or visitation without restriction, unless the challenged beliefs or conduct of the parent are demonstrated to present a substantial threat of . . . harm to the child." *Zummo v. Zummo*, 574 A.2d 1130, 1154–55 (Pa. 1990). The Pennsylvania court emphasized that its standard was one that "requires proof of a 'substantial threat'" of harm and not simply "some probability" of harm or "the speculative possibility of mere disquietude, disorientation, or confusion arising from exposure to 'contradictory' religions." *Id.* at 1155.

¶88 The majority reads *Murga* and *Zummo* differently. In its view, these cases direct a reviewing court to apply strict scrutiny — or, at the very least, something "almost identical" to it — to a district court's decision affecting a parent's right to decide their children's religious upbringing. *Supra* ¶ 64. But the majority sees strict scrutiny where it does not exist. While the *Murga* and *Zummo* courts undoubtedly require a connection between the harm alleged and the restriction imposed, they do not require reviewing courts to walk through the well-established two-part analysis we all know as strict scrutiny.

¶89 In *Zummo*, for example, the court said that a parent must make a showing of "a substantial threat of present or future, physical or emotional harm to the child" to deprive the other parent of the right to "provide religious exposure and instruction." *See* 574 A.2d at 1154–55 (citations omitted). To the majority, this resembles a compelling governmental interest. *Supra* ¶ 64. To me, this mirrors the language in Utah Code section 30-3-32 requiring "a showing . . . of real harm or substantiated potential harm to the child" to rebut the presumption in favor of joint parenting. UTAH CODE § 30-3-32(2)(b).

¶90 The majority heavily relies on a case from the Colorado Court of Appeals, *In re Marriage of McSoud*, 131 P.3d 1208 (Colo. App. 2006). *Supra* ¶¶ 54–57. But *McSoud* does not provide the answer the majority is looking for. As the majority explains, in *McSoud*, "[t]he district court allocated 'sole decision-making regarding the child's

religious upbringing' to the father" and adopted the recommendations of a special advocate "prohibiting both parents from giving 'mixed messages' about religion . . . and . . . dictat[ing] which parent could take the child to church activities." *Supra* ¶ 54 (citing *McSoud*, 131 P.3d at 1218–19). The mother challenged the district court's decision, arguing that it violated both her fundamental parental right to "influence . . . the child's religious upbringing" and her First Amendment right to free exercise. *McSoud*, 131 P.3d at 1214.

¶91 The majority correctly points out that the *McSoud* court upheld the district court's decision allocating sole religious decision-making to the father based on the best interest of the child. *Supra* ¶ 56 (citing *McSoud*, 131 P.3d at 1219). The majority also rightly reads *McSoud* as applying strict scrutiny to the portions of the district court's order adopting the recommendations of the special advocate. *Supra* ¶ 56 (citing *McSoud*, 131 P.3d at 1217). But contrary to the majority's suggestion, the *McSoud* court did not apply strict scrutiny review because it was allocating a fundamental parental right. It applied heightened review to those portions of the district court's order that impacted the mother's *First Amendment* right to free exercise.[94]

---

[94] For what it is worth, the Colorado Court of Appeals reads *McSoud* the way I do. *See In re Marriage of Crouch*, 490 P.3d 1087 (Colo. App. 2021). The *Crouch* court explained,

> [*McSoud*] held that by preventing mother from taking the child to her church during her parenting time, the court unconstitutionally restricted mother's *religious rights*. And, to the extent the order also required the mother to accompany the child to the father's church services during her parenting time, it further restricted her *religious rights*. Because the court was imposing the restrictions, such orders required strict scrutiny. That is, before the court could infringe on the mother's *religious rights*, it must show a compelling state interest
> . . . .

*Id.* at 1092 (emphases added) (citations omitted). The *Crouch* court continued, "*McSoud* expressly rejects the need for strict scrutiny . . . when allocating decision-making responsibility between the child's parents because, in that context, the court is merely expanding one

(continued . . .)

¶92 The *McSoud* court explained that "the best interest standard . . . cannot overcome the express constitutional right to freedom of religion," and where a district court order "not only affects [a parent's] rights with respect to the religious upbringing of her child, [but] also interfere[s] with her own rights under the Free Exercise Clause," it must survive strict scrutiny. 131 P.3d at 1217. Turning to the district court order before it, the *McSoud* court concluded,

> In allocating to father sole decision-making regarding the child's religious upbringing, the court expanded one parent's right to the care, custody, and control of a child at the expense of the other parent's similar right. But as a matter of law, this allocation does not alone deny mother's additional First Amendment rights to influence the child's religious upbringing during her parenting time or to exercise her own religious beliefs.

*Id.* at 1219 (citation omitted). The *McSoud* court then evaluated each of the special advocate's recommendations impacting the mother's religious rights through a strict scrutiny lens. *See id.* at 1219–20.

¶93 Like the court in *McSoud*, I would evaluate the district court's decision allocating religious decision-making to Jessica under the best interest standard. And I would turn to strict scrutiny only to evaluate Ryan's First Amendment claims.

¶94 The majority emphasizes that "Ryan's loss of legal custody does not mean he is completely bereft of parental rights." *Supra* ¶ 48. I agree. A district court's decision to award legal custody to one parent does not necessarily deprive the other, as the majority frames it, from "the right to be [a] parent." *Supra* ¶ 48. I also do not doubt that the right to be a parent includes the right to make major and minor decisions concerning the children's religious upbringing. But in light of section 30-3-32(2)(b), I cannot agree with the majority's conclusion that when a district court finds that a divorcing parent will exercise a parental right to harm a child, its decision to allow one parent to call the shots should be subject to strict scrutiny.

¶95 This is especially true in this instance where the district court's decision is backed by a series of unchallenged factual findings demonstrating that "Ryan's religious practices . . . represent a direct threat of harm to the children." *Supra* ¶ 12 (alteration in

parent's fundamental right at the expense of the other parent's similar right." *Id.* (citation omitted).

original). There is simply no reason that justifies treating a parent's right to direct the child's religious upbringing differently than the other fundamental rights a parent has with respect to the child—rights that we have repeatedly allowed a district court to assign to one parent or the other when it is in the child's best interest.[95]

¶96 This causes me to conclude that strict scrutiny is the wrong test to apply to a court's decision to allocate decision-making over a child's religious upbringing, and even all of the small decisions that might support or undercut that decision-making, to a single parent. I would follow the Utah Code and analyze whether the district court found, by a preponderance of the evidence, real or substantiated potential harm to the child if the parent is allowed to participate in the child's religious upbringing.

¶97 Viewed under the correct test, Ryan cannot show that the district court erred when it assigned the right to make religious decisions for the children to Jessica. The district court found that "Ryan's religious practices . . . represent a direct threat of harm to the children." Specifically, the district court determined that "Ryan wishes to raise [his three young daughters] in a culture that grooms them to be child brides," as evidenced, in part, by Ryan's marriages to teenagers. The district court also found that "[t]he Order's teachings alienate the children from their mother, and ongoing exposure to certain Order teachings would be tantamount to abuse." The district court further noted concerns about "Ryan's desire to raise the children in [the Order], to permit and encourage the

---

[95] To be clear, I am not suggesting that divorcing parents cannot share the right to decide their child's religious upbringing. For example, in *Munoz v. Munoz*, 489 P.2d 1133 (Wash. 1971) (en banc), the court concluded that where "there is no evidence to support a finding that exposure to two religious beliefs has had, or will have, any adverse effect upon the children," a trial court's order prohibiting a noncustodial father from taking his children to his church or to instructional classes sponsored by that church was an abuse of discretion. *Id.* at 1135–36; *see also Murga*, 163 Cal. Rptr. at 82 (rejecting a custodial mother's claim that she had an absolute right to direct the child's religious upbringing and holding that, absent a clear, affirmative showing that the noncustodial parent's religious activities would harm the child, the noncustodial parent could not be restrained from exposing the child to his or her religious beliefs and practices).

children to participate in Order extracurricular activities and his earlier insistence on them attending Order schools," which "lack . . . qualified, licensed teachers" and "[teach] obedience to the 'Order,' compliance to Kingston authority figures, and which encourage[] the children to reject outsiders." Based on these findings—which, again, remain unchallenged—the district court concluded that exposure to Ryan's religious practices would "jeopardize the health or safety of the children, and [would] cause harm to the children's welfare."

¶98 We are presented with an unchallenged factual record that demonstrates that if given the opportunity to influence his children's religious upbringing, Ryan will harm his children. The evidence in the record—evidence that we are duty-bound to accept as true— reveals that Ryan will harm his children by, among other things, promoting a religious culture that will encourage his daughters to be child brides. That evidence also shows that Ryan will teach his children to obey authority figures who will instruct them to reject people outside the Order—people including their own mother. Against this factual backdrop, the district court did not err when it concluded that Jessica alone should exercise all of the parental rights associated with religion.

## II. A District Court's Order Implicating a Parent's First Amendment Right Is Subject to Strict Scrutiny

¶99 Part of what seems to be motivating the majority's concern is the potential overbreadth of the district court's order. The majority concludes that the district court's order "[b]arring Ryan from 'encourag[ing] [the children] to adopt the teachings of any religion'" without Jessica's consent "is not narrowly tailored to protecting a compelling state interest." *Supra* ¶ 71 (second and third alteration in original). The majority states that "[a]s written, the prohibition would prevent Ryan from teaching the children the Lord's Prayer or encouraging them to adopt the teachings of Islam." *Supra* ¶ 70.

¶100 There is absolutely no evidence in the record that Ryan's objection to the district court's order is fueled by a desire to read the Quran to his children or to lead them in the Lord's Prayer. Nor is there any suggestion that such behavior would be interpreted as encouraging the children to adopt religious teachings in violation of the district court's order. And there is nothing in the record that would allow us to conclude that Jessica would withhold her consent from Ryan doing any of those things. A properly briefed First Amendment challenge would have allowed us to get to the bottom of those questions without needing to rely on speculation and hypotheticals.

¶101 In the absence of a properly briefed First Amendment challenge, I respectfully dissent and would affirm the district court's order.

————————