2023 UT App 78

## THE UTAH COURT OF APPEALS

DEJUAN BLAKE,
Appellee,
*v.*
JILLYN SMITH,
Appellant.

Opinion
No. 20210779-CA
Filed July 20, 2023

Third District Court, Salt Lake Department
The Honorable Su Chon
No. 184900112

Julie J. Nelson, Attorney for Appellant

DeJuan Blake, Appellee Pro Se

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Jillyn Smith appeals the district court's order regarding custody and child support for her minor son (Child). Because we determine the court abused its discretion by awarding Smith sole physical and legal custody while requiring joint decision-making between Smith and Child's father, DeJuan Blake, we vacate that part of the court's custody award. Furthermore, because we conclude the court made a mathematical error in calculating the amount of child support, and that a further examination of the evidence of Blake's income is warranted, we reverse the court's child support award and remand for recalculation as appropriate.

BACKGROUND

¶2    Smith met Blake in 2007 in Las Vegas, Nevada, and the two entered into a relationship. As a result of the relationship, Smith became pregnant with Child in 2009. At the time Smith learned about the pregnancy, she was no longer living in Las Vegas—she had moved to Utah to escape her relationship with Blake.

¶3    After a tumultuous pregnancy, during which Blake continuously asked Smith to have an abortion, Child was born in Utah in October 2009. Blake traveled to Utah to visit Child twice during the first year of Child's life, with each visit lasting "maybe an hour or two." The sporadic visits continued over the next few years, with Child and Smith traveling with Blake on short trips together. Although Smith asked Blake for financial support during this time, Blake did not provide support and instead always offered an "excuse." Eventually, the communications between the couple became too toxic and Smith elected to "take a break from communication" with Blake.

¶4    Thereafter, Smith decided to "give [Blake] a second chance." Blake and Child had "maybe a few" "infrequent[]" telephone conversations a year, but the conversations were short due to Child's speech impediment. Blake was not involved in Child's schooling or scheduling, he never attended Child's doctor's appointments, and he "wouldn't follow through" or offer any explanation as to why he could not help Smith with financial support for Child's medical care or educational needs.

¶5    Blake traveled to Utah in 2015 to attend Child's birthday party. Toward the end of the party, Blake and Smith had a verbal altercation regarding Blake's failure to honor their agreement for Blake to pay Smith child support. Following this visit, Blake returned to Utah once in 2016 to attend Child's baseball game. That visit also ended in a verbal altercation.

¶6 In January 2018, Blake petitioned the district court for paternity and custody of Child. At the time, Child was eight years old and living with Smith.

¶7 After initiating custody proceedings, Blake filed a series of three financial declarations with the district court. Blake is self-employed and owns a company managing professional and aspiring boxers. Blake's stated gross income, monthly expenses, and debt listed on each of the three financial declarations differed significantly. In the first declaration, Blake claimed $0 in gross monthly income, $1,875 in monthly expenses, and a debt of $7,240. In the second, Blake claimed $2,000 in gross monthly income, $17,797 in monthly expenses, and no debt. And in the third, Blake claimed $1,686 in gross monthly income, $3,947 in monthly expenses, and no debt. The bank statements filed with each disclosure were incomplete; however, the bank statements that were submitted showed that between August 2017 and January 2019, Blake made deposits into his personal account totaling $456,669.98, and that during that same time, he made withdrawals totaling nearly $50,000 for investments in cryptocurrency, payments to his mother, payments to the mother of one of his other children, and luxury clothing.

¶8 The case proceeded to a bench trial in October 2020. At trial, Smith detailed the relationship between Child and Blake. She explained that Blake had never been actively involved in Child's life and that Blake had not seen Child at all since May 2016. Smith testified that she and Blake had reached an "original agreement" for child support where Blake would pay her $1,000 per month. She further testified that this agreement did not start until 2015—when Child was already six years old—and that the payments had lasted for only one month. In total, Smith estimated that Blake had contributed $1,600 in support payments "over the entirety of [Child's] life."

¶9      Following trial, the district court adjudicated Blake as Child's father, awarded Smith sole physical and legal custody of Child, and awarded Blake standard relocation parent-time pursuant to Utah Code section 30-3-37, which is approximately 17% of the year. In reaching its legal custody determination, the court analyzed the statutory factors outlined in Utah Code sections 30-3-10 and 30-3-10.2 and concluded that the presumption favoring joint legal custody had been rebutted and that joint legal custody was not in Child's best interest. However, the court ordered a joint decision-making arrangement between the parties, requiring that the parties "discuss with each other decisions that should be made regarding [Child]." The arrangement further provides, "If there is a dispute, the parties should attend mediation and each pay half of the mediation fees. If the dispute remains, then [Smith] will have final say. [Blake] can . . . bring the matter to court if he is unsatisfied with the decision."

¶10      Regarding child support, the district court primarily calculated Blake's past child support payments based on his 2018 tax record, where he claimed $45,050 in gross receipts and $34,483 in deductions. After reviewing the evidence, the court concluded that several of the deductions—totaling $27,530—were unsupported and accordingly struck those deductions. Based on this, the court found that Blake's "annual income should be $23,790" through March 2020. However, given the outbreak of the COVID-19 pandemic, the court concluded that "Blake's income has come to a halt," and it accordingly found it "appropriate . . . to impute minimum wage income of $1,257/month from March 2020 forward."

ISSUES AND STANDARDS OF REVIEW

¶11      Smith now appeals the district court's order regarding custody and child support, raising two issues for our review. First, Smith argues the court abused its discretion when it "issued an internally inconsistent [custody] award" giving Smith "sole legal

and physical custody but also order[ing] joint decision-making" between her and Blake. "We review custody determinations under an abuse of discretion standard, giving the district court broad discretion to make custody awards." *K.P.S. v. E.J.P.*, 2018 UT App 5, ¶ 24, 414 P.3d 933 (quotation simplified). "But this broad discretion must be guided by the governing law adopted by the Utah Legislature. And on matters of statutory interpretation, we review for correctness." *Dahl v. Dahl*, 2015 UT 79, ¶ 155, 459 P.3d 276 (quotation simplified). And "[w]here the court's findings are internally inconsistent on a material point, reversal and remand are appropriate." *Vandermeide v. Young*, 2013 UT App 31, ¶ 21, 296 P.3d 787, *cert. denied*, 308 P.3d 536 (Utah 2013).[1]

---

1. Blake did not file a brief or otherwise appear in this appeal. Although "an appellee's failure to file a brief does not amount to an automatic default and consequent reversal of the lower court," our supreme court has recently recognized that such failure does impact the "typical burden of persuasion on appeal." *See AL-IN Partners, LLC v. LifeVantage Corp.*, 2021 UT 42, ¶ 19, 496 P.3d 76 (quotation simplified). Because an appellee's failure to raise any argument leaves the appellant's claims "unrebutted," *see Broderick v. Apartment Mgmt. Consultants, LLC*, 2012 UT 17, ¶¶ 18–21, 279 P.3d 391, "when an appellee fails to present us with any argument, an appellant need only establish a *prima facie* showing of a plausible basis for reversal," *AL-IN Partners*, 2021 UT 42, ¶ 19 (quotation simplified). We question whether the standard articulated in *AL-IN Partners* should apply the same way in cases such as this where the standard of review on appeal is deferential to the discretionary decisions of the district court. But because this issue was not briefed and our decision on both arguments presented ultimately involves the conclusion that the district court did abuse its discretion and committed other errors, we need not decide the issue today. However, we note the question

(continued…)

¶12 Second, Smith argues the district court abused its discretion when it calculated Blake's income for purposes of child support. "We review the district court's decisions regarding child support . . . under the abuse of discretion standard." *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 13, 508 P.3d 612 (quotation simplified). Where the court's findings contain mathematical error or conflict with the record, we will remand for recalculation. *See Miner v. Miner*, 2021 UT App 77, ¶¶ 57–60, 496 P.3d 242.

## ANALYSIS

### I. Custody

¶13 Smith first challenges the district court's custody award, contending the court abused its discretion in crafting the award because it is "internally inconsistent." According to Smith, the joint decision-making arrangement "undermines" her award of sole physical and legal custody because it "allows [Blake] to force mediation and litigation whenever he disagrees with a decision made by [Smith], even though she has sole legal and physical custody." We agree.

¶14 As an initial matter, the Utah Code does not define "sole physical custody" or "sole legal custody." But in *Hansen v. Hansen*, 2012 UT 9, 270 P.3d 531, our supreme court provided guidance as to the meaning of those terms. In *Hansen*, the father and the mother were awarded joint custody of their daughter following their divorce. *Id.* ¶ 2. The mother was awarded sole physical custody and the father was ordered to pay child support to the mother. *Id.* Sometime later, the daughter entered a private youth homeless shelter, where she lived through her eighteenth birthday. *Id.* While the daughter was living at the shelter, the father filed a petition with the district court seeking to redirect his

does warrant additional consideration in a case where it is squarely before the court.

child support payments from the mother to the homeless shelter. *Id.* ¶¶ 2–3. The court denied the motion, which denial was ultimately upheld by the Utah Supreme Court. *Id.* ¶¶ 4–5, 30.

¶15    The supreme court's decision centered on the meaning of custody. Although the daughter had been residing at the shelter, the court determined that the daughter's physical custody had not changed; rather, the mother still retained physical custody. *Id.* ¶¶ 15–19, 28. The court explained,

> Family law treatises consistently define custody as a bundle of constituent rights and obligations to a child's possession, care, and control, and explain that the essence of custody is control over all aspects of the child's life coupled with responsibility for the child's welfare. Standard dictionary definitions of custody are to the same effect.
>
> Custody is often divided into two subsets: legal and physical custody. Both encompass a duty of control and supervision. While legal custody carries the power and duty to make the most significant decisions about a child's life and welfare, physical custody involves the right, obligation, and authority to make necessary day-to-day decisions concerning the child's welfare. Although the latter is limited to the right to control the child's daily activities, it still involves a right of control. This grant of authority is necessary so that the custodian can control and discipline the child or make emergency medical or surgical decisions for the child.

*Id.* ¶¶ 16–17 (quotation simplified). Put differently, "the legal duty of control or supervision [is] the essential hallmark of custody." *Id.* ¶ 18 (quotation simplified). Legal custody encompasses the ability to make major decisions in a child's life, while physical

custody encompasses the ability to make day-to-day decisions in a child's life.

¶16    Although the Utah Code does not define sole physical or legal custody, it does define "joint legal custody" and "joint physical custody."[2] Under the current statutory scheme, a parent may be awarded "joint legal custody," which is defined as "the *sharing* of the rights, privileges, duties, and powers of a parent by both parents." Utah Code § 30-3-10.1(2)(a) (emphasis added). As this court has long recognized, the purpose of joint legal custody is to allow "both parents [to] share the authority and responsibility to make basic decisions regarding their child's welfare." *See Thronson v. Thronson*, 810 P.2d 428, 429–30 (Utah Ct. App. 1991), *cert. denied*, 826 P.2d 651 (Utah 1991).

¶17    Taken together, it follows that an award of "sole" legal custody does not involve sharing the "rights, privileges, duties, and powers of a parent." *See* Utah Code § 30-3-10.1(2)(a). Accordingly, when the district court awarded sole legal and physical custody to Smith, it also awarded her alone the "rights and obligations to [Child's] possession, care, and control," *see Hansen*, 2012 UT 9, ¶ 16 (quotation simplified), including the sole authority to "make the most significant decisions about [Child's]

---

2. In relevant part, the statute defines "joint physical custody" as when "the child stays with each parent overnight for more than 30% of the year." Utah Code § 30-3-10.1(3)(a). This particular provision is not applicable here because Blake was awarded standard relocation parent-time which falls below the 30% threshold. *See id.* § 30-3-37. Nevertheless, Utah law is clear that "[e]ach parent may make decisions regarding the day-to-day care and control of the child while the child is residing with that parent." *Id.* § 30-3-10.9(6). Thus, by statute Smith has sole decision-making authority over day-to-day decisions when Child is in her care. Likewise, Blake has decision-making authority over day-to-day decisions when Child is in his care.

life and welfare," *see id.* ¶ 17 (quotation simplified), and the "authority to make necessary day-to-day decisions concerning [Child's] welfare," *see id.* (quotation simplified). It therefore was inconsistent to simultaneously order a joint decision-making arrangement.

¶18   Moreover, the joint decision-making arrangement is at odds with the district court's own findings regarding Child's best interest. "In making a custody determination, a [district] court's primary focus is what custody arrangement would be in the best interest[] of the child." *Grindstaff v. Grindstaff*, 2010 UT App 261, ¶ 4, 241 P.3d 365. Utah law presumes that joint legal custody is in a child's best interest, but that presumption may be rebutted by showing "by a preponderance of the evidence that it is not in the best interest of the child." Utah Code § 30-3-10(3)–(4). And under Utah law, there is "neither a preference nor a presumption for or against joint physical custody or sole physical custody." *Id.* § 30-3-10(8).

¶19   "In determining whether the best interest of a child will be served by ordering joint legal custody or joint physical custody or both, the court shall consider" a number of statutory factors. *See id.* § 30-3-10.2(2). Here, the court analyzed the statutory factors and determined that awarding Smith sole legal and physical custody of Child was in Child's best interest. In particular, the court found that there was "very little evidence provided that either parent could function appropriately with co-parenting skills," that it was "unclear" whether the parties could work together to reach shared decisions in Child's best interest, and that there was "very little evidence" the parties "actually discussed and made decisions together." In light of these findings, it is unclear how the joint decision-making arrangement—which is not limited to major decisions but instead encompasses all decisions—could be properly viewed as advancing Child's best interest. It does not follow from the evidence of the parties' ongoing issues making decisions relating to Child that such an

arrangement would lead to success in the future. Rather, precisely because of the court's findings, it seems likely that such an arrangement would cause ongoing issues, result in costly mediation and additional court involvement, and be detrimental to Child's best interest, which is exactly what Utah law seeks to avoid.

¶20   In sum, the district court abused its discretion when it awarded Smith sole physical and legal custody while also ordering a joint decision-making arrangement between Smith and Blake. Although Utah law does not prohibit a joint decision-making arrangement in cases involving an award of *joint* physical and legal custody, an examination of the underlying statutory scheme reveals that such an arrangement is not compatible with an award of *sole* physical and legal custody. Furthermore, these competing provisions belie the court's own findings regarding Child's best interest as relates to custody. As such, we vacate the portion of the court's custody award ordering the joint decision-making arrangement.

## II. Child Support

¶21   Smith next argues the district court erred in calculating child support. Specifically, Smith takes issue with the court's calculation of Blake's income for purposes of child support, contending the court's calculation (1) contains a mathematical error and (2) is inconsistent with the evidence in the record. We agree.

¶22   The Utah Child Support Act outlines the process by which a district court must evaluate the income of a parent when calculating child support. *See generally* Utah Code § 78B-12-202. To begin, the court must consider the "gross income" of a parent, which the Utah Code defines broadly as including

> prospective income from any source, including
> earned and nonearned income sources which may

> include salaries, wages, commissions, royalties, bonuses, rents, gifts from anyone, prizes, dividends, severance pay, pensions, interest, trust income, alimony from previous marriages, annuities, capital gains, Social Security benefits, workers' compensation benefits, unemployment compensation, income replacement disability insurance benefits, and payments from "nonmeans-tested" government programs.

*Id.* § 78B-12-203(1). And when a parent is self-employed—as is the case with Blake—the statute directs how gross income should be handled. It provides that "[g]ross income from self-employment or operation of a business shall be calculated by subtracting necessary expenses required for self-employment or business operation from gross receipts. . . . Gross income . . . may differ from the amount of business income determined for tax purposes." *Id.* § 78B-12-203(4).

¶23 The district court determined that Blake's income had been impacted as a result of the COVID-19 pandemic and accordingly evaluated his income for purposes of child support based on what he had earned pre-pandemic and what he was earning during the pandemic. On the record before us, we see two errors in the court's calculations. First, the court made a discrete mathematical error in calculating Blake's pre-pandemic income. Second, and more broadly, the court did not consider all the evidence of Blake's finances when calculating Blake's income, both pre-pandemic and at the time of trial.

¶24 First, the district court calculated Blake's past child support payments using his 2018 tax record. On that record, Blake claimed $45,050 in gross receipts. From that, Blake deducted $34,483 as follows: $5,270 for "materials and supplies," $3,605 for "advertising," $360 for "legal and professional services," $500 for "office expense," $21,760 for "other business property," and

$2,988 for "utilities." After viewing the evidence, the court found that Blake had failed to adequately explain why he should be entitled to deductions for "materials and supplies" ($5,270), "other business property" ($21,760), or "office expense" ($500), and it accordingly struck those deductions, totaling $27,530. As a result, the court should have concluded that Blake's income was $38,097, or $3,175 per month rounded. But it did not. Instead, it concluded that Blake's income was $23,790, or $1,983 per month. This value is mathematically incorrect.

¶25    Second, notwithstanding the mathematical error in the court's calculation of Blake's income, the value imputed by the court is inconsistent with the evidence in the record. Utah law is clear that "in contested cases," a judge is entitled to impute income to a parent so long as the judge "enters findings of fact as to the evidentiary basis for the imputation." *See id.* § 78B-12-203(8)(a). "The purpose of such imputation is to prevent parents from reducing their child support or alimony by purposeful unemployment or underemployment." *Connell v. Connell*, 2010 UT App 139, ¶ 16, 233 P.3d 836 (quotation simplified). Accordingly, when imputing income, "the income shall be based upon employment potential and probable earnings considering," among other things, "employment opportunities," "work history," and "occupation qualifications." Utah Code § 78B-12-203(8)(b).

¶26    As explained above, the court calculated Blake's income at $1,983 per month up until the time that the COVID-19 pandemic began in March 2020. And at trial, which was held in October 2020, the court concluded that due to the pandemic, "Blake's income has come to a halt" and therefore determined it was "appropriate . . . to impute minimum wage income of $1,257/month from March 2020 forward." But the financial documents submitted by Blake do not support the low amount of income the court chose to impute.

¶27 Blake's bank records—which were all filed with the court—show that Blake made deposits into his personal account totaling $456,669.98 between August 2017 and January 2019. These deposits included a check for $200,000, which Blake testified "was for my services that was rendered" in connection with a high-publicity boxing match. And in addition to the deposits, Blake's bank records show significant withdrawals. For example, the records indicate that Blake had regularly invested in cryptocurrency, had transferred over $15,000 to his mother, had transferred over $9,000 to the mother of one of his other children,[3] and had spent over $10,000 on luxury clothing.

¶28 Despite the evidence of Blake's spending, Blake did not demonstrate how he was funding his lifestyle, and he claimed only one debt of $7,240 in the first of his three financial disclosures. In light of the foregoing, the district court's determination that Blake was making no money and therefore should be imputed minimum wage is not supported by the evidence. Rather, the evidence suggests that Blake was less than forthcoming with the court as to the actual amount of his income. As such, on remand the court should reevaluate evidence of Blake's finances, his earning capacity, and whether he is voluntarily underemployed and should make a further determination as to whether greater income should be imputed to him.[4] In so doing, the court should take special care to ensure that the final award is void of mathematical error.

---

3. This amount does not include child support payments awarded to the mother, which were $1,000 per month. Those support payments were made directly to Nevada's State Collection and Disbursement Unit.

4. Smith filed a post-trial motion pursuant to rule 59(e) of the Utah Rules of Civil Procedure seeking to amend, among other things,

(continued…)

CONCLUSION

¶29    The district court abused its discretion when it awarded Smith sole physical and legal custody of Child while also ordering a joint decision-making arrangement with Blake. We therefore vacate the court's custody ruling as it relates to the joint decision-making arrangement. The court also abused its discretion when calculating child support. The current award contains a mathematical error and is not supported by record evidence. Accordingly, we reverse the court's award of child support and remand with instructions that the court reexamine the evidence to determine whether greater income should be imputed to Blake.

———————

the court's child support award. The district court issued a Memorandum Decision and Order denying the motion. In analyzing the child support issue, the court stated that "[g]ifts are not generally considered income." This is legally incorrect. As explained above, the Utah Code explicitly defines "gross income" as including "gifts from anyone." *See* Utah Code § 78B-12-203(1). To the extent Blake was gifted items, the court must include the value of those gifts when calculating his income.