**2024 UT App 155**

# THE UTAH COURT OF APPEALS

DEREK LERMAN,
Appellee,
*v.*
MICHELLE LERMAN,
Appellant.

Opinion
No. 20230913-CA
Filed October 31, 2024

Second District Court, Ogden Department
The Honorable Cristina P. Ortega
No. 214901348

David C. Blum, Attorney for Appellant

Brian E. Arnold, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGE GREGORY K. ORME concurred. JUDGE MICHELE M.
CHRISTIANSEN FORSTER concurred, with opinion.

HARRIS, Judge:

¶1     In this divorce case, Michelle Lerman appeals from the trial
court's order awarding her and her ex-husband, Derek Lerman,
joint legal and physical custody of their son (Child). Michelle
contends that the court was not permitted to impose a joint
custody arrangement because Derek did not timely file a
parenting plan, as required by statute.[1] She also asserts that the
court did not properly weigh the custody factors, including most
notably her testimony that Derek committed domestic violence.
And she takes issue with the court's use of a joint custody (as

---

1. Because both parties share the same last name, we use the
parties' first names for clarity and ease of reference, with no
disrespect intended by the apparent informality.

opposed to a sole custody) worksheet to calculate child support. We reject Michelle's assertions and affirm the trial court's order.

BACKGROUND

¶2    Derek and Michelle were married in December 2014 and have one son, Child, who was born two years later. The parties separated in May 2021, and three months later, in August 2021, Derek filed a petition for divorce. In his petition, he requested that the parties "be awarded joint legal custody" but asked that he retain "final decision-making authority," and he requested that he be "awarded the continued primary physical custody" of Child. At the time he filed his petition, Derek did not file a separate parenting plan, as required by Utah law, *see* Utah Code § 30-3-10.8(1) (2021),[2] although the petition did include some additional specifics about Derek's requested custody arrangement.

¶3    In her responsive pleading, Michelle answered and counterclaimed for "sole legal custody" of Child, and in her counterclaim she referenced "domestic violence that has occurred during the marriage." Michelle also requested "primary physical custody." Presumably because she was seeking sole custody, Michelle did not include a parenting plan with her counterclaim.

¶4    The case proceeded to a temporary orders hearing, which took place in May 2022. The record submitted to us does not include a transcript of that hearing. But in the court's eventual order coming out of that hearing, it noted that "[s]ince their

_____

2. Utah's domestic relations laws were recently renumbered, and many of them were amended, effective September 1, 2024. *See* Domestic Relations Recodification, 2024 Utah Laws Ch. 366 (S.B. 95). In this appeal, neither party takes the position that the 2024 changes are applicable here; we therefore follow the parties' lead and apply the version of the law in effect in 2021, at the time Derek filed the petition for divorce.

separation the parties ha[d] worked out a [custody] schedule" under which Michelle had Child for nine overnights in each two-week period and Derek had five overnights. The court found that, under this arrangement, Child was "doing well and appear[ed] to be happy and well-adjusted," and the court therefore ordered "that the 5/9 split remain" in place. After making this ruling, and after taking into account the parties' respective earning capacities, the court ordered Derek to pay Michelle $150 per month in child support on a temporary basis.

¶5    With regard to legal custody, the court noted that "Stipulated Mutual Restraining Orders" were in place between the parties, but that those orders "allow[ed] the parties to communicate about" Child. The court also noted that there were "allegations of domestic violence" made by Michelle against Derek. But the court concluded that the parties had been "able to communicate about" Child, that they had "appropriate co-parenting skills," that they had "been working together to come up with a schedule that [was] best for [Child], and they ha[d] allowed frequent and continuous contact between [Child] and the other parent." For these reasons, the court found that joint legal custody was in Child's best interest, and it ordered that a joint custody arrangement be in place during the pendency of the litigation. In so doing, the court implicitly observed that neither party had yet filed a parenting plan, and it ordered that "the parties are to file proposed Parenting Plans."

¶6    About ten days later, in keeping with the court's order, Derek filed a parenting plan. He did not, however, seek additional leave to do so (other than the command the court gave in its temporary order), and he did not invoke rule 15 of the Utah Rules of Civil Procedure or otherwise attempt to amend his pleadings.

¶7    After the temporary order was in place, the case proceeded to trial, and a one-day bench trial occurred in February 2023. The only witnesses to testify were Michelle and Derek. As relevant

here, Michelle testified that, during the marriage, she suffered domestic violence at Derek's hands. She acknowledged that Derek had never hit or slapped her, but she testified that Derek had repeatedly "raped" her and taken sexual liberties with her without her consent. Indeed, she testified that, in their entire eight-year relationship, she didn't think they "truly ever had consensual sex maybe more than once or twice." And she testified that this abuse had negatively "impacted [her] ability to effectively communicate with Derek." In his testimony, Derek denied these allegations. On cross-examination, Michelle acknowledged that she had never told anyone else, including law enforcement, about the sexual abuse, and that she was still generally able to communicate with Derek as needed to discuss co-parenting Child.

¶8    Michelle also testified that, despite the May 2022 temporary order commanding Derek to pay child support during the pendency of the case, Derek did not actually make any payments or otherwise contribute to payment of Child's expenses until December 2022, when Derek's attorney sent a check for child support for the prior several months.

¶9    At the end of the trial, the court took the matter under advisement, and a few weeks later it issued an oral ruling during a hearing held via videoconference. Eventually, the court entered written findings of fact and conclusions of law memorializing its oral ruling, as well as a decree of divorce. In its ruling, the court analyzed the statutory custody factors and found that joint legal and physical custody were in Child's best interest. With regard to physical custody, the court ruled that "joint physical custody of [Child] should remain as it has been since Temporary Orders which is a 5/9 split with [Michelle] having the majority of overnights." And with regard to legal custody, the court ruled that the existing joint custody arrangement was appropriate because it had been working well and Child "appear[ed] to be doing well and [was] well adjusted to the situation."

¶10    In the context of making its custody rulings, the court discussed Michelle's allegations of domestic violence at some length. The court acknowledged that, given Michelle's testimony, "there was evidence presented . . . that [Michelle] endured domestic violence and sexual assault." But the court stated that "the evidence was clear that none of it was heard in the presence of [Child], and both sides . . . appear since those incidents alleged by [Michelle] . . . to be able to co-parent and communicate for the benefit of [Child]." It noted that, despite the allegations of abuse, Michelle had been "willing to put the needs of [Child] before hers and [had been] able to communicate with" Derek, and that "[n]o issues were presented during trial as to any major conflicts." And the court found that both parties had "the maturity and willingness and ability to protect [Child] from conflicts that arise between them." The court also found no "evidence or any concerns" about either party's "past conduct and demonstrated moral conduct."

¶11    In addition to ordering Derek to pay child support, the court ordered the parties to "equally split [Child's] extracurricular expenses" and to "equally share the cost of all non-covered medical, dental or other health-related expenses incurred for" Child, and it ordered Derek to "reimburse [Michelle] one-half of [Child's] portion of [Michelle's] out-of-pocket health insurance premium costs." To compute Derek's child support obligation, the court used the joint custody worksheet, and it ordered Derek to pay $132 per month in child support.

ISSUES AND STANDARDS OF REVIEW

¶12    Michelle now appeals, and she raises three issues for our consideration. First, she contends that the trial court was statutorily barred from ordering joint custody because, as she sees it, Derek did not timely file a parenting plan. This issue presents a question of statutory interpretation and application of that interpretation to undisputed facts, and in this context we review

the trial court's determination without deference. *See Blake v. Smith*, 2023 UT App 78, ¶ 11, 534 P.3d 761 (stating that, "on matters of statutory interpretation, we review for correctness" (quotation simplified)).

¶13   Second, Michelle challenges the merits of the court's award of joint legal and physical custody, asserting in particular that the court did not appropriately account for the evidence of domestic violence that Michelle presented. "We review custody determinations deferentially, and so long as the [trial] court's discretion is exercised within the confines of the legal standards we have set, and the facts and reasons for the decision are set forth fully in appropriate findings and conclusions, we will not disturb the resulting award." *Kingston v. Kingston*, 2022 UT 43, ¶ 20, 532 P.3d 958 (quotation simplified).

¶14   Finally, Michelle argues that the trial court erred in using a joint custody worksheet to calculate Derek's child support obligation. As explained below, this argument also presents a question of statutory interpretation, and in this context we review the trial court's determination without deference. *See Blake*, 2023 UT App 78, ¶ 11.

ANALYSIS

I. Parenting Plan

¶15   Michelle's first argument is that the trial court's joint custody order was improper—indeed, statutorily barred—because Derek did not file a parenting plan at the time he filed his petition for divorce in August 2021. While we acknowledge Michelle's point that Derek did not strictly comply with the statute's mandate, we nevertheless reject her argument because Derek filed a parenting plan pursuant to the court's specific order, which plan was subsequently accepted by the court.

¶16　Under Utah law, parties who are "requesting joint custody"—as opposed to sole custody—are required to "file and serve a proposed parenting plan at the time of the filing of their original petition or at the time of filing their answer and counterclaim." Utah Code § 30-3-10.8(1) (2021). Derek is subject to this requirement, because in his petition he requested that the parties "be awarded joint legal custody." And later, during both the temporary orders proceedings and at trial, he requested that the court impose a joint physical custody arrangement.[3]

¶17　This requirement is no empty letter. Not only is a parent who fails to timely file a parenting plan not entitled to seek an award of joint custody, but a court in such cases is statutorily barred from making any such award. *See Dahl v. Dahl*, 2015 UT 79, ¶ 158, 459 P.3d 276 ("[T]he complete absence of a parenting plan precludes an award of joint custody . . . ."); *see also Bell v. Bell*, 2013 UT App 248, ¶ 15, 312 P.3d 951 ("Because neither party filed a parenting plan, the trial court exceeded its discretion in awarding joint legal custody to the parties."); *Trubetzkoy v. Trubetzkoy*, 2009 UT App 77, ¶ 13, 205 P.3d 891 ("Because neither party filed a parenting plan, joint legal custody [is] unavailable."). Indeed, our supreme court has described the timely filing of a parenting plan

---

3. "Joint physical custody" is statutorily defined as an arrangement whereunder "the minor child stays with each parent overnight for more than 30% of the year, and both parents contribute to the expenses of the minor child in addition to paying child support." Utah Code § 78B-12-102(15) (2021); *see also McFarland v. McFarland*, 2021 UT App 58, ¶ 36, 493 P.3d 1146. At both the temporary orders hearing and at trial, Derek requested a true 50-50 physical custody arrangement, which is clearly—at least from an overnights standpoint—well within the statutory definition of "joint physical custody." Moreover, even the "5/9 split" that the trial court ordered is within that definition, because a parent who receives five overnights in every 14-day period ends up with more than 30% of the overnights on an annual basis.

as a "prerequisite[] for a [trial] court's award of joint custody." *Dahl*, 2015 UT 79, ¶ 156; *see also* Utah Code § 30-3-10.2(1) (2021) (stating that a court "may order" joint custody if, among other things, "one or both parents have filed a parenting plan").

¶18  On its face, the statute requires that the party seeking joint custody file the parenting plan at the time that party files its initial pleading in the case. *See* Utah Code § 30-3-10.8(1) (2021) (requiring the plan to be filed with the "original petition" or with the "answer or counterclaim"). But our supreme court—when confronted with the question of whether a parenting plan could be timely filed with an *amended* pleading (rather than only with the *original* pleading)—has adopted what it described as "[a] more persuasive construction" of the statute that "brings it in line with [the court's] relatively liberal standards for amendments of pleadings." *Dahl*, 2015 UT 79, ¶ 161. Under this construction, a parenting plan filed along with a court-approved amended pleading is considered to be timely filed. *See id.* ("Rather than trapping parents into the custody option they select at the time of their initial pleading, with no allowance for changed circumstances, a better reading of section 30-3-10.8 would allow parents to file an amended pleading to include a parenting plan, if such an amendment satisfies rule 15 [of the Utah Rules of Civil Procedure]."). The *Dahl* court noted that a trial court's primary objective, in custody cases, is "to consider the best interests of the child in determining any form of custody," *id.* ¶ 160 (quotation simplified), and it noted that rule 15 directs that "leave to amend [pleadings] shall be freely given when justice so requires," *id.* ¶ 161 (quotation simplified). With these principles in mind, the court concluded that "justice is served by allowing parents, and the [trial] court, to consider whether joint custody would be in the best interests of children in a divorce action." *Id.*

¶19  This case is not exactly like *Dahl*, because Derek did not invoke rule 15 and seek leave of court pursuant to that rule to amend his pleading to include a parenting plan. But Derek did

obtain leave of court—indeed, he was expressly ordered by the court, after the temporary orders hearing, to file a parenting plan. Our interpretation of *Dahl* is that its reasoning is broad enough to encompass all situations in which a parenting plan is filed with leave of court or pursuant to court order, even if that leave was not obtained by specific reference to rule 15. In such situations, the trial court will have had an opportunity to assess the situation and take into account factors such as timeliness, bad faith, the justification for any delay, and prejudice to the opposing party. *See id.* ¶¶ 154, 162–66 (concluding that the trial court had not abused its discretion in denying a parent's request to file a parenting plan late in the litigation, just "[o]ne week before trial"). Where a court, after having had the opportunity to weigh those factors, allows or orders the filing of a parenting plan, that parenting plan will be considered timely, unless the court abused its discretion in allowing the filing.

¶20    And in this case, Michelle makes no effort to argue that the court abused its discretion in allowing Derek, after the temporary orders hearing, an opportunity to file a parenting plan. The temporary orders hearing was the first hearing of any kind held in the case. At that point in the litigation, trial was a long way off—it hadn't even been scheduled, and it didn't occur for another eight months. Michelle made no argument to the trial court, and makes no argument here, that she was somehow unable to prepare to address Derek's joint custody claim at trial.[4]

---

4. Michelle also argues that Derek's parenting plan, even if considered timely filed in May 2022, is infirm because it did not include "a verified statement that the plan is proposed by that parent in good faith." *See* Utah Code § 30-3-10.8(5) (2021). But Michelle did not preserve this objection in the trial court. To be sure, she objected to the timeliness of the parenting plan and asserted that the court was not permitted to award any sort of

(continued…)

¶21 Under these circumstances, then, we discern no error in the trial court's interpretation of the relevant statute. When Derek filed his parenting plan in May 2022 after having been ordered to do so by the trial court, that filing is considered timely, even though it was not included in Derek's original pleading. The trial court was therefore not statutorily barred from making an award of joint custody after trial.

## II. The Custody Factors and Domestic Violence

¶22 Next, Michelle takes issue with the merits of the trial court's award of joint custody, and she asserts that—especially considering her allegations of domestic violence—the court should have rejected Derek's request for joint legal and physical custody and, instead, should have awarded her sole legal and physical custody of Child. On this record, we discern no abuse of discretion in the court's award of joint custody, although we offer some guidance for courts regarding how to assess domestic violence allegations in joint custody cases.

¶23 The touchstone of any custody determination is the best interest of the child in question. *See* Utah Code § 30-3-10(2) (2021) ("In determining any form of custody and parent-time . . . , the court shall consider the best interest of the child . . . ."). And "[i]n determining the form of custody and parent-time that is in the best interests of the minor child," courts are invited to consider a long list of factors. *Id.* (listing factors that "may" be considered

joint custody due to the absence of a timely filing. But Michelle has not shown that she made the separate argument that, even if timely, the parenting plan should be disregarded because it was missing the verified statement of good faith. Accordingly, we do not further consider Michelle's argument in this regard. *See Horne v. Horne*, 2022 UT App 54, ¶ 6, 511 P.3d 1174 ("We generally do not address unpreserved arguments raised for the first time on appeal." (quotation simplified)).

"[i]n determining any form of custody"); *id.* § 30-3-10.2(2) (listing factors that "shall" be considered "in determining whether the best interest of the child will be served by ordering joint" custody). Where a joint custody request has been made, all of these factors must be considered, at least in some fashion. *See Tilleman v. Tilleman*, 2024 UT App 54, ¶ 34, 549 P.3d 65 ("[I]n undertaking any joint custody determination, courts are required to consider, in some fashion, all the section 10(2) factors and all the section 10.2(2) factors."), *cert. denied*, Sept. 12, 2024 (No. 20240842); *see also Martinez v. Sanchez-Garcia*, 2023 UT App 60, ¶ 21, 532 P.3d 105 (stating that courts evaluating requests for joint custody "are statutorily required to consider, at least in some form, twenty-five enumerated factors, as well as any other relevant factor" (quotation simplified)).

¶24 In this case, Michelle's challenge to the way the trial court assessed the relevant factors is actually quite narrow: she focuses on only one of the factors, and she asserts that the court "improperly ignored" her testimony that Derek had committed domestic violence against her. Michelle correctly notes that "evidence of domestic violence" is listed multiple times as something courts are instructed to consider when making custody determinations. *See* Utah Code § 30-3-10(2)(a) (2021) (listing "evidence of domestic violence" as the first factor to be considered in any custody determination); *id.* § 30-3-10(3) (noting the general "rebuttable presumption that joint legal custody . . . is in the best interest of the child," but then stating that this presumption does not apply in cases in which there is "evidence of domestic violence"). But we disagree with Michelle's assertion that the trial court "ignored" her testimony about domestic violence.

¶25 In its post-trial ruling, the court discussed Michelle's domestic violence allegations, observing that, given Michelle's testimony, "there was evidence presented . . . that [Michelle] endured domestic violence and sexual assault." The court noted, however, that "the evidence was clear that none of it was heard in

the presence of [Child]." The court repeated this sentiment one more time in its ruling, stating a few pages later that "none of [the domestic abuse] appears to have occurred in the presence of [Child]." Michelle criticizes these comments, and she directs our attention to our opinion in *In re C.C.W.*, 2019 UT App 34, 440 P.3d 749, a termination-of-parental-rights case in which we held that "it is not sufficient to say . . . that acts of domestic violence are not relevant in a termination case simply because none of the violence was directly visited upon the [c]hildren," *id.* ¶ 23.

¶26　We agree with Michelle that the basic holding of *In re C.C.W.*—that domestic violence should not be ignored or "compartmentalize[d]" simply because it did not happen to, or in the presence of, the children, *id.* ¶ 19—has as much application in the domestic relations context as it does in the parental termination context. After all, the legal framework that applies in both contexts, albeit applied slightly differently, is the best-interest-of-the-child test. In the termination context, the question is whether it is in the child's best interest for the court to terminate a parent's rights. *See id.* ¶ 16. And in the family law context, the question is which kind of custody arrangement—e.g., joint or sole, how many overnights, how much should co-parents be asked to work together to make decisions—is in the child's best interest. *See* Utah Code § 30-3-10.2(1), (2) (2021). In either context, it is relevant to the best-interest inquiry whether and to what extent the parent in question is a perpetrator of domestic violence. And in either context, such violence cannot be brushed aside simply because it did not occur in the child's presence.

¶27　As we observed in *In re C.C.W.*, "both common sense and expert opinion indicate that a parent's acts of domestic violence can have adverse impacts on a child, even if that child is not the direct object of such violence, and even if the child does not directly witness the violence." 2019 UT App 34, ¶ 20 (citing authorities). And as far as we are aware, the social science in this regard has not materially changed in the last five years. *See, e.g.,*

G. Anne Bogat et al., *Developmental Consequences of Intimate Partner Violence on Children*, Ann. Rev. Clinical Psych., May 2023, at 303, 310 (noting that even prenatal intimate partner violence can have "long lasting effects on children's physiology and mental health"); Jenniffer K. Miranda et al., *Growing Up with Intimate Partner Violence at Home: Adolescents' Narratives on Their Coping Strategies*, 38 J. Fam. Violence 105, 105 (2023) ("After three decades of research, it is well-established that [intimate partner violence] has a significant negative impact on the development and well-being of children and adolescents."). Thus, we clarify that—in family law cases just as in parental termination cases—a court may not ignore, or completely discount, evidence of domestic violence committed by a parent merely because that violence was not visited upon the child or committed in the child's presence.

¶28    But that is not a fair characterization of what the trial court did here. To be sure, the court noted that the violence Michelle described had apparently all taken place outside of Child's presence; had the court concluded its analysis at that point, we would be presented with a different case. But here, the court went on to discuss the evidence of domestic violence more thoroughly. As it had in its temporary order, the court observed that the parties themselves had worked together to come up with the "5/9 split" custody arrangement, and that this arrangement had been working well since it had been put into place. The court noted that, despite the evidence of domestic violence, "both sides . . . appear[ed] since those incidents alleged by [Michelle] . . . to be able to co-parent and communicate for the benefit of [Child]." Further, the court explained that, despite the allegations of abuse, Michelle had been "willing to put the needs of [Child] before hers and be able to communicate with" Derek as necessary about Child. Indeed, the court found that "[n]o issues were presented during trial as to any major conflicts" and that "there [did] not appear to be any issues or concerns when it comes to the past and present ability of both parties to cooperate and make decisions jointly." And the court found that both parties had "the maturity

and willingness and ability to protect [Child] from conflicts that arise between them." The court also found no "evidence or any concerns" about either party's "past conduct and demonstrated moral conduct."

¶29 As we noted in *In re C.C.W.*, the fact that a parent has committed domestic violence is certainly a mark against that parent and must be taken into account in the best-interest analysis, but

> not every parent who has committed domestic violence deserves to have his or her parental rights terminated. Each case must be judged on its own merits, and in appropriate cases a trial court might reasonably find, among other things, that the domestic violence issues in the case are not sufficient to counsel in favor of termination; that the parent in question has taken meaningful steps to change his or her life and make amends; that under the circumstances presented there is no significant risk of continued violence; or that, even when all incidents of past violence are fully considered, the children would be better off with the parent still playing an active role in their lives than they would be if the parent's rights were terminated.

2019 UT App 34, ¶ 23. And while it is "not sufficient to say . . . that acts of domestic violence are not relevant . . . simply because none of the violence was directly visited upon" the child in question, *id.*, the fact that the violence occurred outside the presence of the child may nevertheless be relevant to the court's overall assessment of the situation.

¶30 We also note the deferential standard of review that is applicable in this context. In our view, trial courts are afforded some discretion in this area for good reason: it is unfortunately quite common, in family law cases, for (at least) one parent to level

domestic violence allegations against the other. Trial courts should of course take such allegations seriously, and they should—in accordance with statutory mandate—consider "evidence of domestic violence" in making custody determinations. *See* Utah Code § 30-3-10(2)(a) (2021). In doing so, however, trial courts are put in the rather difficult and unenviable position of having to figure out whether the case at hand involves (a) credible evidence of serious domestic violence, (b) less-credible allegations that a party may be raising primarily for litigation-related purposes, or (c) something in between. In the crucible of family law cases, it is sometimes difficult to tell what the situation is, but this much is clear: trial courts are in a far better position to make that determination than we are. *See McFarland v. McFarland*, 2024 UT App 31, ¶ 20, 547 P.3d 204 ("[Trial] courts and other fact-finding tribunals are in a superior position to weigh facts that depend upon credibility determinations, the direct observation of witness testimony, and other evidence not fully captured in a written appellate record." (quotation simplified)); *cf. Butler v. Mediaport Ent. Inc.*, 2022 UT App 37, ¶ 48, 508 P.3d 619 (stating that trial courts "will almost always have a better vantage point than" appellate courts from which to ascertain whether "a [party] has really been harmed" by a late discovery disclosure "or is just feigning harm for" litigation purposes).

¶31   Applying this deferential standard of review, we do not interpret the trial court here as having done that which is forbidden: ignore or compartmentalize domestic violence merely because it happened outside a child's presence. Instead, we view the trial court as having done exactly what was required: it "consider[ed]" Michelle's "evidence of domestic violence" and sufficiently explained why, notwithstanding that evidence, it found a joint custody arrangement to be in Child's best interest. We discern no abuse of discretion in the court's analysis, and we therefore reject Michelle's arguments to the contrary.

III. Joint Custody Worksheet

¶32  Finally, Michelle contends that the trial court's use of the joint custody child support worksheet—as opposed to the sole custody worksheet—was improper. In particular, Michelle asserts that use of a joint custody worksheet is proper only when the payor spouse, at the time the order is put in place, has a spotless past record of contributing to the child's expenses. We disagree.

¶33  Both parties proceed from the assumption that the joint custody worksheet should be used whenever the custody arrangement in question qualifies as "joint physical custody," and this is a correct understanding of the law. In previous cases, we have applied the statutory definition of "joint physical custody" in assessing whether use of the joint custody worksheet is appropriate. *See Pankhurst v. Pankhurst*, 2022 UT App 36, ¶¶ 21–23, 508 P.3d 612; *Spall-Goldsmith v. Goldsmith IV*, 2012 UT App 302, ¶¶ 9–10, 288 P.3d 1105.

¶34  "Joint physical custody," as statutorily defined, "means the child stays with each parent overnight for more than 30% of the year, and both parents contribute to the expenses of the child in addition to paying child support." Utah Code § 78B-12-102(15) (2021); *see also McFarland v. McFarland*, 2021 UT App 58, ¶ 36, 493 P.3d 1146. This definition includes two parts—an overnights threshold and an expense-paying requirement—and both parts matter. An arrangement does not constitute joint physical custody, no matter how many overnights a parent has, if one parent is relieved from any obligation to contribute to "the expenses of the child in addition to paying child support." *See* Utah Code § 78B-12-102(15). A parent who is not contributing to expenses, over and above child support, is therefore required to pay *more* child support—through use of the sole custody worksheet—than a parent who is making expense contributions.

¶35  Here, Derek argues that the trial court's use of the joint custody worksheet to calculate his child support obligation was

entirely appropriate, because in his view both parts of the statutory definition of "joint physical custody" are met here: under the terms of the custody and support order that the court put into place at the conclusion of the trial, Derek enjoys five out of every 14 overnights with Child, which is more than the 30% statutory threshold, and he has been ordered to pay one-half of some of Child's specific expenses (such as extracurricular expenses and health insurance costs) in addition to his monthly child support obligation. In Derek's view, questions regarding use of the joint custody worksheet are ordinarily forward-looking, and depend on whether the current order affords each parent more than 30% of the overnights and, in addition, requires each parent to make contributions to the child's expenses. Because the order in effect in this case—the one the court entered after trial—meets both of these criteria, Derek asserts that use of the joint custody worksheet was appropriate.

¶36 Michelle takes a different view. As she sees it, use of the joint custody worksheet was not appropriate here because, during the months leading up to trial, Derek made "only a single child support payment . . . (albeit [one that] covered [several] months)" and "did not pay any medical bills nor any insurance premiums." Thus, in Michelle's view, questions regarding use of the joint custody worksheet are backward-looking and depend on whether the noncustodial parent is completely current on his or her support and expense-paying obligations. In support of her argument, she directs our attention to *Pankhurst* and *Spall-Goldsmith*. But those cases do not support her argument.

¶37 In *Spall-Goldsmith*, the father argued that "the trial court was required to apply the joint custody worksheet" because "he was granted overnight visitation that exceeds the thirty percent threshold" contained in the statutory definition of "joint physical custody." 2012 UT App 302, ¶ 5. But the mother responded by pointing out that the operative custody and support order not only did not require the father "to contribute to [the child's]

expenses in addition to child support," but it also allowed him to credit any payments he made for the child's extracurricular payments "against his child support obligation." *Id.* The mother also noted that the father had not voluntarily made any such expense payments, over and above child support. *Id.* ¶ 10. Under these circumstances, we held that the father had "not established that he and [the mother] share[d] joint physical custody," and that the trial court had correctly used the sole custody worksheet to compute the father's support obligation. *Id.* Thus, we view *Spall-Goldsmith* as a case that supports Derek's interpretation, because our assessment in that case turned, first and foremost, on whether the father was currently ordered, under the then-operative custody and support order, to share in the payment of expenses.

¶38   Similarly, in *Pankhurst*, we concluded that the arrangement was not a joint physical custody arrangement, because the operative custody order—which had been arrived at by stipulation—allowed the father, at his option, to "exercise parent-time up to ten overnights per month," but the father "had not actually exercised *any* overnights" at all for an entire year. 2022 UT App 36, ¶¶ 4, 22. For this reason alone, use of the sole custody worksheet was appropriate in that case. As for the other part of the statutory test for "joint physical custody," it is unclear from the factual recitation in *Pankhurst* whether the operative order required the father to pay half of extracurricular and health insurance expenses. But we noted that, based on the evidence presented, "there [was] no basis to presume that [the father] contributed anything significant beyond child support to [the children's] expenses" during the time he had elected not to exercise parent-time. *Id.* ¶ 23.

¶39   As noted, we interpret these cases as being largely supportive of Derek's position. But in the event that those cases are a touch unclear on the point, we take this opportunity to clarify that use of the joint custody worksheet is appropriate in cases where the operative order being put into place both

(a) affords each parent at least 30% of the overnights and (b) requires each parent to contribute, over and above child support, to the child's expenses (e.g., extracurriculars, day care, medical costs, or health insurance). Because the custody and support order that the trial court put into place after the trial meets both of these statutory criteria, the court's use of the joint custody worksheet to calculate Derek's child support obligation was appropriate.

¶40    Michelle's remedy, in the event that Derek does not fulfill his obligations to pay both child support and one-half of the enumerated additional expenses, is not to seek a retroactive switch from the joint custody worksheet to the sole custody worksheet. Rather, Michelle's remedies lie elsewhere. If Derek falls behind in his child support obligation or does not make required contributions to expenses, Michelle may of course file a motion to enforce the court's custody and support order, *see* Utah R. Civ. P. 7A, and may seek attorney fees in connection with that request, *see* Utah Code § 81-1-203(2). Alternatively, depending on the circumstances, she might be able to seek modification of the operative custody and support order and ask the court to relieve Derek, in the future, of his obligation to pay one-half of the enumerated expenses but instead use the sole custody worksheet to calculate child support. *See* Utah R. Civ. P. 106. But as long as the operative order meets both of the statutory criteria, Derek's child support obligation is properly calculated using the joint custody worksheet.

CONCLUSION

¶41    The trial court was not statutorily barred from considering an award of joint custody, because Derek filed a parenting plan relatively early in the case and at the direct order of the court. In making its custody ruling, the court did not abuse its discretion in assessing the various statutory custody factors, including the evidence Michelle presented that Derek had committed domestic

violence. And the court appropriately used the joint custody worksheet to compute Derek's child support obligation.

¶42 Affirmed.

_____

CHRISTIANSEN FORSTER, Judge:

¶43 I fully concur in the majority opinion's affirmance of the trial court's joint custody award and use of the joint custody worksheet to calculate the appropriate child support obligation. I write separately only to further expand on the majority's point that in the domestic relations context, intimate partner violence can have a significant negative impact on the development and well-being of children, *see supra* ¶¶ 26–30, and to provide additional guidance. Here, notwithstanding Michelle's testimony about sexual violence during the marriage, given the whole evidentiary picture presented to the court and the standard of review on appeal, I cannot conclude that the trial court exceeded its considerable discretion in finding a joint custody arrangement to be in Child's best interest. But, in the context of what is in the best interest of a child in these situations, I urge trial courts to carefully consider the negative impact intimate partner violence can have on the co-parent relationship, which, in turn, can negatively impact children as well.

¶44 As highlighted by the majority opinion, when making a custody award, the court's primary concern is the best interest of the child. *See* Utah Code § 30-3-10(2) (2021) (current version at Utah Code § 81-9-204(1) (2024)). Joint legal custody is the presumed option because children do best when they have full access to and the opportunity to spend maximum quality time with both parents. But the presumption that joint legal custody is in the best interest of the child is rebutted in cases when there is evidence of domestic violence or sexual abuse involving a parent. *See id.* § 30-3-10(3)(a) (2021) (current version at Utah Code § 81-9-205(2)(a)(i) (2024)). Likewise, the Utah Legislature has made

evidence of domestic violence or sexual abuse of a parent the paramount factor to consider in a custody decision. *See id.* § 30-3-10(2)(a) (2021) (current version at Utah Code § 81-9-204(3)(a) (2024)). This reflects a legislative determination that intimate partner violence has an adverse effect on children and that an adverse effect may be presumed whenever violence is present in the household. *See Burns-Marshall v. Krogman*, 433 P.3d 1121, 1125 (Alaska 2018) ("The primary purpose of the statutory domestic violence presumption in child custody cases is to protect children from potentially adverse custody determinations in response to growing evidence that domestic violence has severe and long-lasting effects on children . . . by ensuring that domestic violence is adequately and specifically included when courts analyze[] a child's best interests." (quotation simplified)).

¶45    Joint custody is not in the best interest of a child where intimate partner violence is present because the perpetration of violence by one parent against the other has a very high likelihood of creating a lasting power and control imbalance between the abuser and the abused. *See What Is Domestic Violence?*, U.S. Dep't of Just., Off. On Violence Against Women, https://www.justice.gov/ovw/domestic-violence [https://perma.cc/ E72X-PECF] (defining domestic violence as "a pattern of abusive behavior in any relationship that is used by one partner to gain or maintain power and control over another intimate partner")*.* After all, intimate partner violence is not about the act of abuse itself; rather, it is about power and control and dominance. *See Heck v. Reed*, 529 N.W.2d 155, 164 (N.D. 1995) ("Domestic violence is not caused by stress in the perpetrator's life, alcohol consumption, or a particular victim's propensity to push a perpetrator's buttons. Rather, domestic violence is a learned pattern of behavior aimed at gaining a victim's compliance." (citation omitted)); *see also D.O.H. v. T.L.H.*, 799 So. 2d 714, 725 (La. Ct. App. 2001) (Woodard, J., dissenting) ("Violence against women is a learned behavior, and . . . batterers use violence to maintain control over their partners." (quotation simplified)). Furthermore, there are many

ways in which children are affected by intimate partner violence in the home even when the violence does not occur in the children's presence. Impacts include learning the wrong lessons about relationships, which puts the child at risk of perpetuating an intergenerational cycle; inhibiting the development of positive attachment with the abused parent; and undermining the opportunity to observe and learn about positive relationships. *See* Gillian R. Chadwick & Stef Sloan, *Coercive Control in High-Conflict Custody Litigation*, 57 Fam. L.Q. 31, 46 (2024) ("Children who experience coercive control are also at higher risk of internalizing poor relationship skills that harm their current or future relationships. For instance, exposure to domestic violence can contribute to sibling conflict and violence. Additionally, children who witness and experience coercive controlling violence are also at higher risk of becoming perpetrators or victims of domestic violence in adulthood. Given that children learn about how to engage in relationships by observing their caregivers, coercive controlling abuse, even when not aimed directly at a child, models and condones such behaviors for children." (footnotes omitted)). Accordingly, a parent who has been abused by their partner should not be forced into a custody arrangement that perpetuates those power imbalances caused by intimate partner violence—an assertion in harmony with recent statutory amendments wherein the legislature has emphasized that when making a custody determination, "[t]he court shall consider as primary, the safety and well-being of the minor child and the parent who experiences domestic violence." Utah Code § 81-9-204(10)(b) (2024).

¶46 In this case, after considering the evidence presented by the parties, the trial court noted that the sexual assaults described by Michelle had all taken place behind closed doors and outside of Child's presence. The court went on to note that the parties had come up with the "5/9 split" custody arrangement early in the proceedings based upon their respective caretaker functions and work schedules and that Child "appears to be doing well and is well adjusted to the situation since the separation." While the trial

court's finding that Michelle is "willing to put the needs of [Child] before hers and [is] able to communicate with [Derek] . . . [without] major conflicts" is somewhat concerning given the testimony alleging sexual assault and rape here and the power imbalance such violence might create, the trial court examined the evidence presented at trial, evaluated the character and credibility of the parties, and determined a joint custody arrangement was not problematic. And it is not my place to discount or second-guess the trial court's determinations that it "did not find any evidence of any issues that would impair either parent's capacity to function as a parent and to co-parent," that "[t]here was no evidence presented as far as any type of negative impact or influence by either party upon [Child]," that "there have not been any major issues that have interfered with the parties' ability to co-parent," and that the court did not have any concerns about the moral conduct of the parties.

¶47 Therefore, applying a deferential standard of review, I agree that there was no abuse of discretion in the trial court's finding that a joint custody arrangement was in Child's best interest.

———